UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| BONNIE A. MANCHESTER,<br><br>Plaintiff<br><br>v.<br><br>TOWN OF LUDLOW,<br>SCHOOL COMMITTEE OF THE TOWN OF LUDLOW,<br>TODD H. GAZDA, individually and in his official capacity as former Superintendent of Schools, Ludlow Public Schools,<br>DR. FRANK TIANO, individually and in his official capacity as Superintendent of Schools, Ludlow Public Schools,<br>STACEY MONETTE, individually and in her official capacity as former Principal of Paul R. Baird Middle School,<br>MARIE-CLAIRE FOLEY, individually and in her official capacity as former school counselor of the Paul R. Baird Middle School, and<br>JORDAN FUNKE, individually and in her official capacity as former librarian of the Paul R. Baird Middle School,<br><br>Defendants | Civil Action No.<br><br><br><br>**COMPLAINT<br>FOR<br>INJUNCTIVE RELIEF, DAMAGES,<br>AND<br>DECLATORY JUDGMENT**<br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## I.  **INTRODUCTION**

1.      This Complaint seeks to vindicate the rights of plaintiff, Bonnie A. Manchester ("Ms. Manchester" or "plaintiff"), who, on May 19, 2021, was terminated from her decades-long employment as a teacher at Paul R. Baird Middle School in Ludlow, Massachusetts ("Baird" or the "School") after having been disciplined and placed on paid administrative leave by the School three (3) months earlier for "conduct unbecoming a teacher". What constituted the

purportedly unbecoming conduct was this: a single, brief, after school conversation held in private and on private property in which plaintiff had informed the father of an *eleven (11) year-old female student* of plaintiff that his daughter had transmitted an email to a dozen of her teachers announcing that she, the *eleven (11) year-old female student*, was "genderqueer".

2.    Although this lawsuit arises out of the transgender debate that has engulfed the country in recent years, this case is not about the civil rights of transgendered people. Nor is not about the rights of gender questioning children. Those rights are not at issue; indeed they are unassailable. Rather, this case is about the civil rights of a forty-nine (49) year-old female teacher. These rights too should have been unassailable; but they were not. Instead, they were aggressively traduced by defendants who pursued a years-long bullying campaign and conspiracy against Ms. Manchester that culminated in her termination.

3.    The proximate cause of plaintiff's termination was a brief conversation that Ms. Manchester had off School property with the father (the "Father") of a then-eleven (11) year-old at-risk female student in her charge (the "Female Child"). In that conversation (the "Parent-Teacher Communication"), plaintiff adverted to an email she and many other teachers at the School had received from the Female Child in which the latter had announced her "genderqueer" status and so-called "preferred pronouns". In sharing that information with the Father, plaintiff was engaging in core speech and association guaranteed by the First Amendment, protected speech that defendants subsequently, and perversely, characterized as "conduct unbecoming a teacher" and cited as the grounds for her punishment and subsequent termination.

4.    The fact that such communications between teachers and parents on subjects affecting the health and well-being of the latter's children, especially under-age, at-risk children, has been integral to all systems of education since the dawn of history did not matter to

2

defendants.

5.      Worse (if that is possible), the fact that the School recognized the importance of such parent-teacher communications, particularly in regards to the "families' home language, *culture*, and *values*" (*see infra*, ¶41, emphasis supplied), by making such communication a criterion in the School's evaluation forms for teachers, did not matter to defendants.

6.      Worse still, the fact that there was no articulated School rule, policy, or guideline, written or oral, prohibiting the kind of teacher-parent communication and association in which plaintiff engaged, and that was seized upon as grounds for her termination, did not matter to defendants.

7.      Still worse, the fact that the subject matter conveyed to the Father in this case (i) was made at the specific request of the Female Child herself, (ii) has never been objected to by the parents of the Female Child, and (iii) might have been a vital step in the parents seeking and obtaining valuable and perhaps life-saving psychological counseling for the at-risk Female Child, that too did not matter to defendants.

8.      Even worse, the fact that defendants' termination of plaintiff for engaging in protected speech with the Father constituted classic First Amendment retaliation/viewpoint discrimination did not matter to defendants.

9.      But worst of all, plaintiff's termination was not an isolated event. It was the culmination of a multi-year saga involving numerous meetings, reports, interviews, emails, letters, shifting and amorphous justifications, and persistent and evolving efforts on the part of defendants to marginalize plaintiff and make their inexcusable conduct towards her internally coherent in the face of serious questions concerning its legality.

10.      Odious as all this is when viewed in the abstract, the actions of defendants

chronicled in this Complaint become even more vile considering that they were deployed against a woman who, in spite of severe physical disabilities, managed to compile an exemplary record of achievement during her twenty-three (23)-year career at the School teaching students in grades six (6) through eight (8), many of whom were at-risk.

11.     But despite Ms. Manchester's sterling record, she simply had to go. So defendants, resorting to treachery and intrigue, engaged in a civil conspiracy that not only traduced norms of fundamental fairness but violated the rule of law, core American freedoms, and plaintiff's civil rights, including, without limitation: Ms. Manchester's First Amendment rights of freedom of speech and association, her Fourteenth Amendment right to equal protection under the Constitution of the United States, her civil rights guaranteed under the Constitution of the Commonwealth of Massachusetts, and her rights under the Massachusetts Civil Rights Act (G. L. Ch. 12, §§ 11H, 11I).

12.     In so doing, defendants have worked nearly incalculable harm upon an honorable woman.

13.     Plaintiff now brings this action against defendants seeking: (i) declaratory and injunctive relief in the form of a declaratory judgment that defendants' vague, arbitrary, capricious, discriminatory, and heretofore unarticulated (much less written) action of prohibiting and punishing communications between parents and teachers concerning their young children's gender identity is constitutionally impermissible and, further, that this Court issue an Order enjoining defendants from continuing such action; (ii) monetary and other damages; (iii) compensatory damages; (iv) reinstatement with backpay; (v) punitive damages; and (vi) attorneys' fees, expenses, and costs pursuant to 42 USC § 1988.

## II.   **JURISDICTION AND VENUE**

4

14.     This Court has subject matter jurisdiction under 28 USC §§1331 and 1343(a)(3) and (4). This case arises under a federal cause of action pursuant to 42 U.S.C. § 1983. This Court has supplemental jurisdiction over the Massachusetts Civil Rights Act claim under 28 U.S.C. §1367. Jurisdiction is also proper under 28 U.S.C. § 1332(a)(1) as the amount in controversy exceeds $75,000 and is between citizens of different states.

15.     An actual controversy exists between the parties that involves substantial constitutional issues as plaintiff alleges that defendants' conduct has and continues to violate the United States Constitution and deprive plaintiff of her rights thereunder while defendants are expected to assert that their conduct comport with the United States and Massachusetts Constitutions and Massachusetts law.

16.     Venue is proper in this district under 28 U.S.C. §1391(b). Most defendants reside or have their principal place of business in this judicial district, and a substantial part, if not all, of the events and omissions giving rise to this action occurred in this judicial district.

17.     This Court is authorized to grant declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, implemented through Federal Rule of Civil Procedure 57, and to issue injunctive relief under Federal Rule of Civil Procedure 65.

18.     This Court is authorized to grant Plaintiffs' prayer for relief regarding costs, including a reasonable attorney's fee, under 42 U.S.C. §1988.

### III.  PARTIES

19.     Plaintiff Bonnie A. Manchester is a forty-nine (49) year-old resident of the Town of Ludlow who served for twenty-three (23) consecutive years as a middle school teacher at Baird.  Plaintiff resided in the City of Chicopee, Massachusetts when the events giving rise to this Complaint occurred.

20.    Defendant Town of Ludlow ("Ludlow"), with a principal address of 488 Chapin Street, Ludlow, MA 01056, is a body corporate under M. G. L. c. 40, §1, with the capacity to sue and be sued. M. G. L. c. 40, §2,

21.    Defendant School Committee of the Town of Ludlow ("School Committee"), with an address at 205 Fuller Street, Ludlow, MA 01056 is the governing board with final policymaking responsibility over the Ludlow Public Schools (the "District"). M. G. L. c. 71, §37. At all relevant times the School Committee was responsible for the adoption, amendment, repeal, and enforcement of District policies, including the adoption of policies that govern conduct and expression of teachers and administrators in the District.

22.    Defendant Todd H. Gazda ("Gazda") is the former Superintendent of Schools for the District and is, upon information and belief, a resident of West Hartford, Connecticut. When the events giving rise to this Complaint occurred, Gazda as Superintendent, acted as the chief executive, educational, and administrative officer of the District. Pursuant to M. G. L. c. 71, §59, his responsibility and authority included oversight and control of the District and management of the District in a manner consistent with state law, the Constitution of the United States, and the policy determinations of the School Committee. He is sued in his individual and official capacities.

23.    Defendant Frank Tiano ("Tiano") resides in Ludlow, Massachusetts and is the current Superintendent of the District. Pursuant to M. G. L. c. 71, §59 his responsibility and authority includes oversight and control of the District and management of the District in a manner consistent with state law, the Constitution of the United States, and the policy determinations of the School Committee. He is sued in his individual and official capacities.

24.    Defendant Stacy Monette ("Monette") is, upon information and belief, a resident

of Brewster, Massachusetts and at all relevant times was the principal of Baird, a school within the District. Pursuant to M. G. L. c. 71, §59B, defendant Monette, as principal, was the educational administrator and manager of Baird whose responsibility and authority included not only the management of the School and School property, subject to the supervision and direction of the Superintendent, but also the hiring and termination of School personnel, subject to the prior approval of the Superintendent. M. G. L. c. 71, §59B. She is sued in her individual and official capacities.

25.    Defendant Marie-Claire Foley ("Foley") is, upon information and belief, a resident of Belchertown, Massachusetts and at all relevant times was a Grade 6 School Counselor at Baird. She is sued in her individual and official capacities.

26.    Defendant Jordan Funke ("Funke") is, upon information and belief, a resident of Winooski, Vermont and at all relevant times was the librarian of Baird. She is sued in her individual and official capacities.[1]

## IV.  STATEMENT

A.        Plaintiff's exemplary record as a middle school teacher ……………….. 7

B.        Defendants' history of hostility and bad faith towards plaintiff ………. 15

C.        Plaintiff's medical history …………………………………………… 28

D.        Plaintiff's purportedly "unbecoming" conduct …………….……….. 29

E.        Defendants' retaliation against plaintiff and plaintiff's termination ...…… 40

### A.        Plaintiff's Exemplary Record as a Middle School Teacher

27.    After an undergraduate career during which she excelled not only academically but also athletically as an outstanding soccer player, plaintiff was awarded a BS degree with a

---

[1] Funke's employment with the School ended in June of 2021. As of this writing, plaintiff is unaware of Funke's preferred pronouns.

double major in elementary education and Psychology by American International College in Springfield, Massachusetts in 1996.

28.    For the next two (2) years plaintiff was employed as a substitute teacher in the Springfield and Ludlow (Massachusetts) school systems. Then, in 1999, while working for the Key Program in Springfield, Ms. Donna Hogan, then principal of Baird, persuaded plaintiff to apply for a full-time teaching position with the District for grades six (6) through eight (8).

29.    Plaintiff applied, was hired, and began full-time employment at Baird on October 18, 1999. The glowing letters of recommendation that accompanied plaintiff's application to Baird foreshadowed an exemplary career in education that was about to unfold. During plaintiff's twenty-three (23)-year tenure at the School, she was universally beloved by students, admired by parents, liked and respected by her peers, and esteemed by those administrators whose duty it was to assess her performance.

30.    Plaintiff's personnel file reflects that from her earliest days at Baird, her gifts as a middle school educator were recognized and valued by all. Not only is her record without blemish; it is filled with encomiums from parents, peers, and principals attesting to her excellence. The following is but a small sampling:

> "These students have grown and thrived under Ms. Manchester's watchful eye…. We are very happy that she is at Baird …." [2]

> "Congratulations! … You have demonstrated a high level of skill and professionalism. You are an asset to our organization. Thank you for your dedication." [3]

> "You are a role model to all – personifying the teacher who works diligently inside and outside of her classroom." [4]

---

[2] December 13, 2000 Ludlow Public Schools Formal Observation Report authored by Ms. Donna M. Hogan, former principal of Paul R. Baird Middle School.
[3] September 17, 2004 letter of commendation from John J. Welch, former Superintendent of Ludlow Public Schools.
[4] May 4, 2005 letter of commendation from Donna M. Hogan, former principal of Paul R. Baird Middle School.

"… thank you so much for sharing, and taking the time to send his work to me, i [*sic*] really think you are doing a great job with him, and i [*sic*]  thank you so much. he [*sic*] has been comming [*sic*] home full of confidence and happy.[5]

31.    Amidst these general accolades, there is one particular strength that shines forth with luminous clarity: Ms. Manchester's truly extraordinary ability to deal effectively with at-risk students and those experiencing behavioral and emotional issues.

32.    As with her more general skills as a teacher, this particular gift of being able to look into the troubled heart of the at-risk middle school student and to provide healing and hope was noted and admired early and often by plaintiff's superiors at Baird, so much so that by her third year as a teacher (2001), plaintiff was overseeing the School's so-called "Substantially Separate Program", offered to students whose emotional needs required a behavioral modification program.

33.    As with plaintiff's other performance evaluations, those memorializing her teaching skills in the area of at-risk students also sparkle, perhaps even more so. Here, by chronological order in which they were dispensed, is a brief sampling:

> Ms. Manchester was hired for this position only a few weeks ago. The change in this classroom is dynamic. The atmosphere is positive, caring, and consistent. *This is one classroom where one teacher has made a tremendous difference…. Keep up the good work*!" [6] [Emphasis supplied.]
>
> "*She has brought stability to these students' lives, and she has also given them confidence in their own abilities and hope for the future*. Ms. Manchester has been a true success in this classroom of students with many emotional needs." [7] [Emphasis supplied.]
>
> "Ms. Manchester's program provides an opportunity for at-risk students to stay on campus and succeed in their own community…. we are very happy that she is at Baird,

---

[5] February 2, 2007 email to plaintiff from a grateful mother of a student.
[6] December 13, 1999 Ludlow Public Schools Formal Observation Report authored by Ms. Donna M. Hogan, former principal of Paul R. Baird Middle School.
[7] May 11, 2000 Ludlow Public Schools Formal Observation Report authored by Ms. Donna M. Hogan, former principal of Paul R. Baird Middle School.

and that our students with such emotional needs can be successfully serviced here, as well…. *Please share your classroom management strategies with your peers*." [8] [Emphasis supplied.]

"This program [the Substantially Separate Program] is very successful at Baird due to Ms. Manchester's direction and skills. Her students are the most challenging in the building, yet she has provided them with a home base that is nurturing, structured and accepting. *Every single student has improved under her guidance.* …. [*She] keeps parents informed of their children's progress in clear terms every day. We are also planning some parent information nights during the next school year. Ms. Manchester would be a valuable source as a panelist discussing adolescent behavior."* [Emphasis supplied.] [9]

"She has been extremely successful over the years in addressing her students' emotional needs while continuing their individual academic programs…. *Ms. Manchester makes classroom management of at-risk students look easy.* She is patient, repeats questions, guides answers, and keeps students on task. Her students respond to her established routines, her point system, and her obvious acceptance of each individual. For many, she is the most responsive adult they see all day. *Her students are better people because of her. Please continue to share your classroom management strategies with your peers*." [Emphasis supplied.] [10]

"Ms. Manchester continued to challenge her students to think for themselves. *Ms. Manchester is a veteran working with at-risk students in a behavioral classroom.* She is patient with interruptions, but she is a pro at bringing them back to the task at hand. She is relaxed but firm with them, and *it is obvious from their responses that they feel safe and confident in her challenging classroom. Please continue to share your expertise in working with at-risk students with your colleagues at Baird*." [Emphasis supplied.] [11]

34.    Despite these sparkling evaluations, plaintiff did not allow success as a middle school teacher to "go to her head". Throughout her more than two (2) decades of service to the School, plaintiff strove constantly to improve as a teacher, registering for courses and seminars that honed her professional skills so that she might better serve others.

35.    The following are a few of the entities from which plaintiff sought out and

---

[8] December 13, 2000 Ludlow Public Schools Formal Observation Report authored by Ms. Donna M. Hogan, former principal of Paul R. Baird Middle School.
[9] April 13, 2001 Ludlow Public Schools Formal Observation Report authored by Ms. Donna M. Hogan, former principal of Paul R. Baird Middle School.
[10] December 13, 2001 Ludlow Public Schools Formal Observation Report authored by Ms. Donna M. Hogan, former principal of Paul R. Baird Middle School.
[11] December 14, 2005 Ludlow Public Schools Formal Observation Report authored by Ms. Donna M. Hogan, former principal of Paul R. Baird Middle School.

received courses and instruction in various areas of professional development, and the years of her enrollment: American International College, Springfield (2000, 2002 & 2003), Plymouth State College (2003), Crisis Prevention Institute, Inc. (2008), the University of Massachusetts (2012), the Bureau of Education & Research (2015), the Research for Better Teaching (2017), Fitchburg State University (2017), and Google-University of La Verne (2018).

36.     Perhaps the high point of plaintiff's professional development came in July 2003, when she successfully completed the requirements for a Masters Degree in Special Education from American International College in Springfield, Massachusetts, receiving her diploma the following May, with a cumulative GPA of 3.965 and a semester GPA of 4.000.

37.     In addition, to these formal initiatives, plaintiff also earned educator's certificates and several special licensures in elementary and special needs education from the Commonwealth of Massachusetts Department of Elementary and Secondary Education ("DESE").

38.     Not surprisingly, as a result of plaintiff's innate gifts as a teacher, her diligent efforts at professional development, her magnanimity towards peers,[12] and her empathetic approach towards students, she became not only a highly credentialed member of the School community but one highly sought after to fill many of the extracurricular roles created by the School.

39.     Thus, in addition to her formal teaching duties,[13] plaintiff has served in several extracurricular positions, including, without limitation, the following: Special Education Coordinator for the School, MCAS Teacher, MCAS Tutor, Instructional Support Teacher

---

[12] Plaintiff's personnel file reflects numerous instances of her generosity towards peers, even to the point of donating sick days for use by other teachers.

[13] Since August 29, 2011, plaintiff has held the position of Social Studies Teacher.

Yearbook Advisor, CO-Club Advisor, coordinator of the School's teams participating in Junior Achievement in Western Massachusetts, participant in the School's Peer Coaching process, and as a volunteer on committees designed to improve the educational environment of the School in areas such as anti-bullying and improvement of attendance.

40.    Beginning in September 2013, the School adopted a new evaluation protocol for teachers that entailed evaluations every two (2) years. The forms used for these evaluations (the "Forms") contained a rubric that incorporated four (4) general areas or "standards" ("Standards") upon which teacher performance was based: Standard I: Curriculum, Planning and Assessment; Standard II: Teaching All Students; Standard III: Family and Community Engagement; and Standard IV: Professional Culture.

41.    The Forms broke each of the four (4) Standards down into sub-categories or "Elements". A total of thirty-three (33) different Elements were subsumed under the four (4) Standards. Each Element permitted a teacher to be rated according to a scale that ran from lowest to highest as follows: "Unsatisfactory", "Needs Improvement", "Proficient", and "Exemplary".

42.    During her first set of evaluations under the new system covering the period from September, 2013 through May, 2015 (the "First Evaluation"), plaintiff recorded an exceptional performance, never receiving an evaluation on any of the thirty-three (33) elements that was less than "Proficient", and on thirteen (13) of the Elements receiving the highest evaluation of "Exemplary".

43.    An especially relevant criterion was Standard III of the Forms, that rated teachers in the area of "Family and Community Engagement". One of the five (5) "Elements" under this Standard is entitled "Parent/Family Engagement". To attain a rating of "Exemplary" for this Element, a teacher must meet a level of engagement with the student's family described as

follows:

> "Successfully engages most families and sustains their active and appropriate participation in the classroom and school community." [Emphasis supplied.]

To attain a rating of "Proficient" under this Element, as plaintiff did in her 2013-2015 evaluation, a teacher must meet a School-articulated criterion that reads thusly:

> "Uses a variety of strategies to support every family to participate actively and appropriately in the classroom and school community."

44.     A second Element under Standard III is entitled "Two-Way Communication". To attain a rating of "Exemplary" under this Element a teacher must meet a criterion that reads in part as follows:

> "Regularly uses a two-way system that supports *frequent, proactive* and *personalized communication with families about student performance and learning.*"  [Emphasis supplied.]

To attain a rating of "Proficient" under this Element, as plaintiff did in her 2013-2015 evaluation, a teacher must meet a School-articulated criterion that reads thusly:

> "*Regularly uses two-way communication with families about student performance and learning* and responds promptly and carefully to communications from families." [Emphasis supplied.]

45.     A third Element under Standard III is entitled "Culturally Proficient Communication". To attain a rating of "Exemplary" under this Element, a teacher must meet a School-articulated criterion that reads in part as follows:

> "Always communicates respectfully with families and demonstrates understanding and *appreciation of* different families' home language, *culture, and values.*"  [Emphasis supplied.]

To attain a rating of "Proficient" under this Element, as plaintiff did in her 2013-2015 evaluation, a teacher must meet a School-articulated criterion that reads thusly:

13

"Always communicates respectfully with families and demonstrates understanding of and *sensitivity to* different families' home language, *culture, and values*." [Emphasis supplied.]

The thin ceiling that separates a "Proficient" and an "Exemplary" rating under this Element is shattered when a teacher exhibits not merely "sensitivity to" different families' culture and values (Proficient) but actual "appreciation of" those cultures and values (Exemplary).

46.     During her second evaluation under the new system that encompassed the period running from September, 2015 through May, 2017 (the "Second Evaluation"), plaintiff recorded a performance that was, if anything, even more exemplary than that reflected in her First Evaluation. Of the thirty-three (33) elements on which she was rated in the Second Evaluation, plaintiff received an evaluation of "Exemplary" on twenty-six (26), and "Proficient" on seven (7). *Cf.*, ¶42.

47.     Despite her superlative performance as recorded in the Second Evaluation, in none of the five (5) Elements subsumed under Standard III ("Family and Community Engagement") did plaintiff demonstrate improvement beyond the rating of "Proficient" attained in each of those five (5) Elements in the First Evaluation.

48.     As a result of her excellent, but static, performance in all five (5) Elements contained in Standard III ("Family and Community Engagement"), plaintiff was determined in entering the next evaluation period to demonstrate improvement in this area (i) by "engag[ing] … families and sustain[ing] their active and appropriate participation in the classroom" (*see supra*,¶43) (ii) through more "frequent proactive and personalized communication with families" (*see supra*, ¶44), and (iii) by "demonstrat[ing] understanding and appreciation of different families' home language, culture, and values". *See supra*, ¶ 45.

**B.    Defendants' History of Hostility and Bad Faith Towards Plaintiff**

49.    In 2012, Sheryl Stanton, then principal of Baird, hired defendant Jordan Funke as the School librarian.

50.    Funke has a history as an LGBTQ+ activist,[14] and at the time of her hiring, was, upon information and belief, a biological woman "transitioning" from female to male.

51.    Funke had no teaching responsibilities at the School, was not assigned a classroom, and, at least initially, had little, if any, formal contact with students beyond those occasioned by her role as librarian.

52.    Despite this, since her earliest days at Baird Funke had managed to be a controversial, polarizing, and corrosive figure. She embraced the role of *agent provocateur* and did little to disguise the fact that she was dedicated to a not-so-hidden agenda. That agenda, in plaintiff's view, had little, if anything, to do with education but a great deal to do with ensuring that impressionable middle school children were introduced to a highly sexualized view of the world that was as controversial as it was harmful.

53.    Funke first began to raise eyebrows among parents and teachers in September 2014 when she displayed in the School library posters promoting newly acquired library books by an author named John Green that many considered far too explicitly sexualized for middle school students.

54.    When a number of parents complained to the School not only about the posters but also about the judgment of defendant Funke in displaying them, Funke promptly removed the posters, claiming, disingenuously, that she had not carefully examined the posters before displaying them.

55.    The following year, 2015, defendant Funke, either alone or with others, began

---

[14] A brief biography of Funke is accessible through the website translategender.org, unless removed.

slyly altering the character of the Baird library through a two-pronged strategy that consisted of: (i) removing classic volumes from the shelves, and (ii) introducing new books into the School's library under a category devised by Funke and misleadingly entitled "Health and Science".

56.     A number of these new books that Funke introduced contained sexually explicit content - either in the form of illustrations, explicit descriptions of sexual activity, or both. Some promoted a gay lifestyle, others trans. All advanced a view wherein gender confusion, sexual experimentation, promiscuity, or all three were considered normal.

57.     Parents began to notice; and to complain. In 2015, Ms. Cheryl Patineau, a parent of a sixth (6th) grade daughter, objected to a book entitled *CUT* that had been introduced to the Baird library by defendant Funke.

58.     Following the complaint by Ms. Patineau, the parents of two (2) other sixth (6th) grade children raised objections about other books in circulation at the School library

59.     One of those parents, Ms. Heather Cruz, a member of the faculty at the University of Connecticut, had grown concerned over the nature of certain sexually-charged questions being posed to her by her eleven (11) year-old daughter. Upon investigation, Ms. Cruz discovered that Funke had recommend to her daughter, Abby, a book entitled *A Court of Mist and Fury*, the second volume in a series entitled *A Court of Thorns and Roses*. After reviewing the book, Ms. Cruz concluded that its sexualized content was absolutely inappropriate for middle school students and complained to the School. The School quietly removed the book from the Baird library.

60.     The content of some of the books that Funke introduced was readily discernible from their titles. For example, one book, *Sex is a Funny Word* by Corey Silverberg, contains

16

graphic illustrations and descriptions of sexual activity;[15] another entitled *Gender Queer: A Memoire* is a so-called "graphic novel" containing images of teens engaged in oral sex that are so graphic that even Facebook and Instagram flagged posts containing them for violating those sites' policies against pornography;[16] and *Gender Queer Workbook,* a companion volume to *Gender Queer,* was described as a guide for teens and young adults exploring gender identity.

61.    In other instances, Funke introduced books into the Baird library whose inappropriate, indeed offensive, content was camouflaged beneath innocuous titles. One such book entitled *Beyond Magenta* was described as a groundbreaking work of LGBT literature, and featured, among other things, descriptions of pedophilia and a child protagonist who has been sexually abused and exploited since infancy. So lurid are the contents of these books that decorum prevents even a sampling being included as an exhibit to this Complaint.

62.    Since her arrival at Baird, Funke had been lobbying the School administration to launch a program known by its acronym "DIRT" (Directed Individual Reading Time). DIRT enshrined a concept that seemed innocent enough: a fifteen (15)-minute enrichment period each day during which every student would have the opportunity, and the obligation, to read books not only beyond the scope of those assigned in class but also free from the supervision and guidance of adults and teachers. In September of 2019 the school introduced the DIRT program. Whatever good intentions may have inspired it, the DIRT program provided Funke, who theretofore had no reason to be interacting with students on a regular basis, much less assigning reading materials to them, a pretext for doing both.

---

[15] Other titles introduced into the library by Funke include: a series entitled "A Court of Mist and Fury", "Gender Queer Workbook", "Perfect Chemistry", "Kiss 8", and the so-called "graphic novels" (i.e. comic books) "Speak" and "Shout", each of which also contained graphic descriptions of sexual activity, and, in some instances graphic illustrations.

[16] *See* https://www.theepochtimes.com/new-york-education-department-promotes-sexually-explicit-book-for-national-reading-event_4314803.html

63.     Although the nature of the books introduced by Funke remained for a time "under the radar", the institution of the DIRT program caused more and more parents and teachers to became aware of the highly offensive content to which Funke was exposing their children and students. When the predictable parental objections ensued, the response of the School was to implement a policy allowing parents to opt their children out of the DIRT book choices being advocated by defendant Funke.

64.     Since the Fall of 2016 plaintiff had been aware of the Baird library book controversy, but it was sometime later that she and Funke actually clashed.

65.     The *casus belli* was an incident that occurred in the early Spring of 2017, after plaintiff had given the six (6) grade students in her Ancient History Class a research assignment on Greek mythology. Not yet aware of defendant Funke's practice of introducing middle school children to sexually inappropriate material, plaintiff had included Funke in her lesson plan as one of the persons the students could consult for source material. Plaintiff soon learned that Funke, under the pretext of assisting several sixth (6th) grade students in their research, had provided them with videos depicting explicit, and possibly criminal, sexual activity.

66.     The content of these videos was such that it would have raised eyebrows had an adult supplied them to college-age students; that Funke supplied them to impressionable and innocent sixth (6th) graders struck plaintiff as perverse and inexcusable. Plaintiff confronted Funke directly about the incident and complained to Laura O'Keefe, the head of the Social Studies Department, and to defendant Monette. But defendant Monette, did nothing. For her part plaintiff was thereafter careful not to include Funke in her lesson plans.

67.     Prior to the incident involving the Greek mythology videos, plaintiff had been aloof from the simmering controversy triggered by Funke's introduction of inappropriate,

18

sexualized books to the School library, preferring to let concerned Baird parents, and the School's administration, take the lead. But with this incident, plaintiff became outspoken, raising the alarm among parents and fellow teachers, and forcefully voicing her concerns to defendants Monette and Gazda. Plaintiff also attempted to speak to defendant Funke directly; but when she did so, Funke childishly sabotaged her efforts by exhibiting to plaintiff photographs on Funke's cell phone that plaintiff deemed inappropriate.

68.     In part because of plaintiff's efforts, the controversy surrounding Funke and the Baird library soon attracted the attention of the School Committee, much to the chagrin of defendants Monette, Gazda and Funke, among others. As a result, the School Committee approved on May 23, 2017 a protocol whereby a parent or teacher concerned about the suitability of a book or other material in the Baird library could initiate a review process to determine its appropriateness for middle school children.

69.     Defendant Funke's questionable behavior was not limited to introducing twisted and offensive material to Baird middle school children. Funke had a particular appetite for slandering Baird teachers who crossed her or did not share her views as to the sort of materials to which middle school children should be exposed.

70.     On one occasion, Funke spread false and malicious rumors among certain students at Baird concerning Ms. Angie Testori, a seventh (7th) grade English teacher, claiming, incorrectly, that Ms. Testori did not like certain students. When Ms. Testori, and the students themselves, complained to then-principal Joseph Langone, Langone directed defendant Funke to write a letter of apology to Ms. Testori.

71.     By the Fall of 2019, following two years of simmering tension between plaintiff and certain of the defendants, the library book controversy had spilled over to other members of

19

the Baird staff. Two camps formed and battle lines were drawn: plaintiff, who continued to press the issue with defendants Funke, Monette and Gazda, was the *de facto* leader of one camp, while those three defendants were arrayed against plaintiff in the other.

72.     Plaintiff was especially disappointed in, and outspokenly critical of, defendant Monette, who, as principal of Baird, had demonstrated little, if any, leadership in the controversy surrounding the objectionable books and other materials introduced by Funke.

73.     Initially defendant Monette appeared to have washed her hands of the issue, announcing in frustration at one School staff meeting that "It [the issue of the books] was dealt with and I'm not talking about it." But by the Fall of 2019, Monette had clearly joined forces with defendant Funke, confronting and, indeed, belittling those teachers, including plaintiff, who opposed Funke's introduction of objectionable books and material into the School library.

74.     The animosity directed towards plaintiff by the defendants would occasionally descend to humorously adolescent depths, of the kind one would more likely expect to find among college sorority sisters than among professional educators. For example, in the Fall of 2019, defendant Monette and her Baird staff allies organized a day when all teachers sympathetic to Monette wore pink to school (purportedly defendant Monette's favorite color) in a show of solidarity with her against plaintiff. One teacher at the School, in a text message to another teacher, explained the reasons for this manifestation of support for Monette: "a faculty member [plaintiff] that [*sic*] has been giving her [Monette] a very hard time almost to the point of having [*sic*] her resign."

75.     The targeting of plaintiff was not limited to juvenile, color-based expressions of solidarity by members of the School staff who disagreed with her. Plaintiff's increased outspokenness over the growing dispute involving sexually explicit books in the School library

20

resulted in Ms. Manchester experiencing a pronounced decline in the quality of her performance evaluations.

76.     During her third and final evaluation under the new system that encompassed the period running from September, 2017 through May, 2019 (the "Final Evaluation"), plaintiff recorded a performance that, while more than satisfactory for many teachers, was not up to the level of plaintiff's prior exemplary evaluations. Thus, of the thirty-three (33) elements on which she was rated, plaintiff received an evaluation of "Exemplary" on only two (2); on the remaining thirty-one (31) elements she received an evaluation of Proficient".

77.     Ironically, in the Final Evaluation plaintiff did show improvement in one notable area: the element entitled "Culturally Proficient Communication". Here, for the first time, her evaluation reflects an actual improvement from the level of "Proficient" to that of "Exemplary", meeting the School-articulated criterion for "Exemplary" performance that reads in part as follows:

> "*Always communicates respectfully with families* and demonstrates understanding and *appreciation of* different families' home language, *culture, and values*." [Emphasis supplied.]

78.     As the 2019 school year began, defendants' mismanagement of the library book controversy was becoming increasingly apparent to more and more observers; so too was the animosity of defendants towards plaintiff that had been steadily building for over a year.

79.     The ill-will exhibited by defendants towards plaintiff intensified following an incident that occurred in plaintiff's classroom on the afternoon of Friday, September 13, 2019.

80.     Plaintiff was teaching a class of special education students assisted by Ms. Deborah Lucas, also a Special Ed teacher at the School, when Ms. Lucas noticed a then-eleven (11) year-old boy sitting at his desk fondling his private parts in a highly inappropriate and

21

sexualized manner. Ms. Lucas informed plaintiff, and the two approached the boy. They noticed that he had open on his desk the book *Sex Is A Funny Word*.

81.    The provocatively titled book, juxtaposed with the boy's sexualized and highly inappropriate conduct, caused plaintiff to examine the book more closely. When she did, she determined that the book was not only highly inappropriate for middle school children but also highly offensive to many adults. When plaintiff asked the boy how he had obtained the book, the boy replied that defendant Funke had shown him the book and allowed, indeed encouraged, him to check it out of the School library.

82.    As a result of this incident, plaintiff sought and obtained a meeting with defendant Monette on the following Monday and showed her the book entitled *Sex is a Funny Word*. Upon viewing the book's contents, defendant Monette put her head in her hands and stated: "I don't know what this book is doing in our school." She then proceeded to reprimand plaintiff for implying that the presence of the book was the fault of defendant Monette. Although stating to plaintiff that "I will handle this", defendant Monette did nothing.

83.    As the Fall of 2019 wore on, plaintiff realized that any complaints shared with defendant Monette would be met with an admixture of indifference towards the books and hostility towards plaintiff. As a result, plaintiff decided to take her complaints directly to Superintendent Gazda. On November 4, 2019 plaintiff prepared and hand-delivered to defendant Gazda a letter (the "November 4 Letter) that recapitulated an earlier conversation plaintiff had with him in September of 2019 wherein she had expressed her concerns about the sexually explicit nature of the materials being provided to students by defendant Funke. In the November 4 Letter, plaintiff (i) adverted to this earlier conversation, (ii) cited defendant Monette's inertia and irresolution on the subject, (iii) asserted that the offensive materials violated the School's

22

own policy regarding "ideologies and profanity/obscenity", (iv) observed [t]hat there are "many teachers at Baird" who shared her concerns, and (v) requested School Committee involvement.

84. After receiving the November 4 Letter, defendant Gazda scheduled a meeting with plaintiff at the Superintendent's office on the following day (the "November 5 Meeting").[17] At that November 5 meeting, plaintiff reiterated her concerns about the sexually explicit books introduced by defendant Funke and made available to students through the DIRT program, and informed defendant Gazda of the specific incident in her classroom involving the sixth (6th) grade boy engaging in sexualized activity while reading *Sex is a Funny Word"*.

85. Defendant Gazda, for his part, shared some concerns of his own. But these centered not around the presence of objectionable books in the School library but over plaintiff's statements in the November 4 Letter that there were many teachers at Baird who share plaintiff's concerns, and that the School Committee should become involved.

86. The November 5 meeting concluded with defendant Gazda directing plaintiff to ask the other concerned teachers to express their apprehensions in writing and to provide Gazda with specific examples of the materials in circulation at the School library to which those concerns related.

87. Plaintiff did as Superintendent Gazda directed. Within two (2) weeks following the November 5 Meeting, plaintiff delivered to Gazda a letter dated November 18, 2019 (the "November 18 Letter"), signed by herself and seventeen (17) other teachers at Baird. The November 18 Letter, among other things, (i) recounted, with lurid examples, the history of the library books controversy at the School, (ii) admonished the School administration for doing

---

[17] A meeting that plaintiff had scheduled with defendant Monette for November 6, 2019 to discuss identical concerns was peremptorily cancelled by Monette at the eleventh (11th) hour through Google Calendar, without explanation or discussion.

nothing to enforce the School's policies against the promotion of ideologies, profanity, pornography, and obscenity, and, by implication, failing in its mission to protect the psychological and mental well-being of impressionable children under their charge, and (iii) requested School Committee involvement.

88. As a result of the November 18 Letter, defendant Gazda arranged to have plaintiff meet with Ms. Rebecca Bouchard, Esq., the School's Legal Compliance Officer, to discuss the School Committee-approved protocols for reviewing materials in circulation that parents or teachers deemed objectionable. At the meeting, Attorney Bouchard provided plaintiff with the necessary forms required to initiate the approval process.

89. A few days later, in an email dated November 27, 2019 addressed to plaintiff and on which the other seventeen (17) teacher/signatories to the November 18, Letter were copied, defendant Gazda declared himself agnostic on whether one of the books that plaintiff and her cohort of teachers had brought to his attention was "appropriate for Middle school". For the rest, Gazda directed plaintiff to fill out the forms that had been provided to her by Attorney Bouchard in order to initiate the preexisting "school committee approval process" that would ultimately determine the suitability of the books and materials that were the subject of the November 18 Letter.

90. On January 24, 2020, pursuant to the instructions received from defendant Gazda and Attorney Bouchard, plaintiff initiated the School Committee sanctioned approval process (*see supra,* ¶ 64) of the book *Sex Is A Funny Word* by completing, signing, and delivering to defendant Monette a two (2)-page form entitled "Request for Reconsideration of Instructional Resources" (the "Request for Reconsideration").

91. As part of the "school committee approved process", defendant Gazda appointed

a committee to review the books that were the subject of the Request for Reconsideration submitted by plaintiff. The two teachers appointed to the committee were Michelle Annecchiarico and Michelle Damore, two witnesses personally hostile to plaintiff who would later be named by defendant Funke as potential corroborating witnesses against plaintiff in a discrimination complaint that Funke initiated against plaintiff. (*See infra*, ¶¶ 93, 94).

92.    The issue remained controversial enough to be taken up at a meeting of the School Committee scheduled for January 28, 2020.

93.    But on January 27, 2020, the day before that meeting, Funke filed a so-called "Harassment, Bullying, Discrimination, and Hate Crimes Reporting/Complaint" (the "Funke Complaint") against plaintiff on a form approved by the School Committee. The Funke Complaint bore what purports to be Funke's signature but was not executed under the pains and penalties of perjury. A copy of the Funke Complaint is attached hereto as Exhibit A.

94.    In the Complaint, Funke charged as follows: "Bonnie Manchester has been spreading lies about me and accusing me of sexually exploiting students … based in part on her perception of my sexual orientation and gender identity…." The Funke Complaint named defendants Monette and Gazda as corroborating witnesses to plaintiff's alleged misconduct. *Id*.

95.    The allegations of the Funke Complaint were without foundation, were not asserted in good faith, and were advanced by defendant Funke, in collaboration with defendants Monette and Gazda, to bully and intimidate plaintiff because of her outspoken opposition to defendants' role in instigating, and then ignoring, the Baird library book controversy.

96.    The Funke Complaint was also designed to retaliate against plaintiff for completing, three (3) days earlier, the Request for Reconsideration, thus triggering School Committee review of books circulated in the School library by defendant Funke. *See supra*, ¶ 90.

25

97.    In addition, the Funke Complaint was timed to "dirty up" plaintiff prior to the School Committee meeting of January 28, 2020, where defendants knew plaintiff was planning publicly to ventilate her concerns about the offensive books that were the subject of the Request for Reconsideration.

98.    But defendants' collusive strategy failed when plaintiff appeared at the January 28 School Committee meeting and, along with a number of parents and teachers, spoke out against the offensive books that Funke had introduced into the School library, and that defendants Gazda and Monette had allowed to remain there.

99.    As a result, at the January 28, 2020 meeting the School Committee voted to remove the objectionable books from the Baird library until the Committee could review their contents.

100.    Two subsequent meetings of the School Committee were held on February 11, 2020 and March 10, 2020 and at each the controversy of the objectionable books was again addressed. A number of non-parents, including defendant Funke and school librarians from towns other than Ludlow, attended and spoke in favor of retaining the objectionable books in the School's library. In doing so, they expressed views sharply critical of those parents and teachers, including plaintiff, who disagreed with them.

101.    While the issue of the objectionable books appeared momentarily settled, the matter of the Funke Complaint was not.

102.    Following her receipt of the Funke Complaint, plaintiff also received a letter dated February 13, 2020 from Erica A. Faginski-Stark ("Faginski-Stark"), Ed.D., Director of Curriculum and Instruction for the Ludlow Public Schools. In her letter, Faginski-Stark stated that she had been designated by defendant Gazda to "address" the Funke Complaint "under the

District's policy on Promoting Civil Rights and Prohibiting Harassment, Bullying, Discrimination, and Hate Crimes". Faginski-Stark went on to explain that she had been asked to assume her role "in lieu of the building principal since [*sic*] she [defendant Monette] has been identified as a witness" in the Funke Complaint.". The letter (i) directed plaintiff to meet with Faginski-Stark in her office on February 24, 2020 to "discuss" the Funke Complaint, (ii) advised plaintiff that she could attend with "union representation and/or counsel", and (iii) contained a dire warning against retaliation against persons "who take action consistent with this Policy".

103.    On February 24, 2020, plaintiff met with Faginski-Stark, without "union representation and/or counsel", to discuss the Funke Complaint. At the meeting, plaintiff emphatically denied the allegations of the Funke Complaint and Faginski-Stark adduced no evidence supporting them.  The meeting ended without resolution but with Faginski-Stark stating to plaintiff that the School's investigation into the allegations of the Funke Complaint (the "Funke Investigation") would continue.

104.    Plaintiff heard nothing further from the School regarding the Funke Investigation until she received a three (3)-line email from Faginski-Stark dated March 9, 2020 entitled "Informal Review Update". That email referred to the investigation triggered by the Funke Complaint as "an Informal Review process" and referenced a hitherto undiscussed "Proposed Resolution Agreement". That email also informed plaintiff that "we are still in process relative to a resolution" and concluded by stating that "we hope to have more information by the end of this week".

105.    The March 9, 2020 email from Faginski-Stark is the last communication plaintiff has received from the School relative to the Funke Investigation. In the ensuing three (3)-year period, Plaintiff has received no information, much less a written determination, concerning the

27

outcome of the Funke Investigation, despite a requirement set out in the District's Anti-Discrimination/Anti-Harassment Policy and Grievance Procedure that provides in pertinent part as follows:

> *All good faith efforts* will be made to provide a written determination regarding the complaint and any resolution by the Principal or Civil Rights Coordinator to the complainant and the alleged harasser *within thirty (30) school/working days of the complaint.* [Emphasis supplied.]

106. Defendant Funke operated in bad faith in bringing the Funke Complaint, as did defendants Monette, Gazda, and others at the School in failing to resolve the issues raised by it in a timely fashion as District procedures required. Indeed, the Funke Complaint remains officially unresolved *to this* day.

107. This was all done purposefully by defendants in order to punish plaintiff. By means of the false and malicious allegations of the Funke Complaint, and the purposely unresolved Funke investigation that ensued, defendants Gazda, Monette and Funke have created a cloud of suspicion and ugly innuendo under which plaintiff has been laboring for nearly four (4) years. As a result of this sword of Damocles hanging over her head, plaintiff has had to endure patiently all the emotional distress and professional anxiety that such unjust and maliciously false accusations engender.

108. These fears were compounded by the fact that plaintiff's immediate superiors and antagonists, defendants Monette and Gazda, both of whom had signaled their bad will towards plaintiff, were listed by defendant Funke as corroborating witnesses in the Funke Complaint.

### C.    **Plaintiff's Medical History**

109. With the exception of mold and pollen allergies and occasional hypertension, plaintiff had enjoyed generally good health during her first decade at Baird. Her personnel file

28

maintained by the School reflects that during this period, plaintiff was out of work on only two occasions for a total of fifteen (15) days: from February 13, 2006 to February 17, 2006, and from February 23, 2006 through March 8, 2006.

110.     On December 28, 2010, an automobile in which plaintiff was riding as a passenger was involved in a motor vehicle accident ("MVA") from which plaintiff sustained severe injuries resulting in permanent disabilities and requiring hospitalization for approximately twelve (12) days. As a result of those injuries plaintiff took a medical leave of absence; but in late June 2011 was cleared to return to work.

111.     In the ensuing years plaintiff's work history was punctuated by intermittent medical leaves of absence relating to the MVA, most of which were of only a few days' duration, and most of which permitted her return to work on a part time basis. During this period plaintiff continued to receive superlative evaluations up through the fall of 2019.

112.     Following the Funke Complaint in January 2020, the hostile work environment to which plaintiff had been subject became more pronounced, with some of the individual defendants, teachers, and staff exhibiting cold and unfriendly behavior towards her. This atmosphere, combined with the "slow walking" of the Funke Investigation, exacerbated plaintiff's already chronic health issues.

113.     As a result, in the late winter and early spring of 2020, plaintiff began to experience a number of physical ailments associated with her stressful work environment at the School, including, without limitation, abdominal and stomach pain. These stress-related symptoms continued up to the date of her termination by the School and beyond.

**D.      Plaintiff's Purportedly "Unbecoming" Conduct**

114.     Beginning with the onset of the COVID pandemic in March of 2020, the School

shifted to a new teaching paradigm, with teachers and students engaged in virtual classroom learning.[18]

115.    In the ensuing years, a growing body of data has emerged tending to show that the various forms of remote learning imposed on students (particularly young children), by depriving them of regular in-person interaction with peers - a touchstone of healthy adolescent development - have worked a variety of harm, from diminished academic performance to decline in mental and emotional health.

116.    Six (6) months into the pandemic and its protocols, in the Fall semester of 2020, plaintiff was assigned to teach a sixth (6th) grade class in Ancient History comprised of approximately a dozen students. As with all classes offered by Baird during the pandemic, this class was taught virtually by means of an Internet program called "Google Classroom", whereby each student participated remotely on his own laptop known as a "Google Chromebook".

117.    At that time, many teachers at the School, including plaintiff, began to observe more and more students exhibiting behavioral and learning issues. These included symptoms of depression, anxiety, withdrawal, inattention or distraction during the remote classes, and "virtual absenteeism" (i.e., students darkening their computer screens during the virtual classes). More students than normal seemed to be receiving failing grades, and the increased frequency of students who appeared in various ways to be at risk became a frequent topic of conversation among Baird teachers at staff meetings.

118.    Plaintiff, whose expertise in identifying and assisting at-risk students is well-documented,[19] was particularly concerned with one of the students in her sixth (6th) grade class:

---

[18] Many of the events of this case have been played out against the backdrop of the COVID-19 pandemic, an environment where teachers have been forced to teach, and students to learn, virtually.

[19] As previously noted, even a cursory perusal of Ms. Manchester's personnel file will reveal not only an exemplary record as a teacher but also a particular charism for attracting and healing at-risk children. *See supra*, ¶¶31-33.

an eleven (11) year-old girl who shall be referred to in this complaint as the "Female Child".

119.   The Female Child had been a student of plaintiff in years prior to 2020. She had always displayed good work habits and was bright, well-adjusted, academically successful, and personable. By the mid-Fall of 2020, however, plaintiff had become increasingly concerned about the Female Child, who had begun to reflect a depressed demeanor, social detachment, and a marked decline in academic performance characterized by a failure to hand in assignments, failing grades, and a diminished work ethic.

120.   By early December 2020, plaintiff was contemplating notifying the parents of the Female Child about her concerns, even as plaintiff had notified the parents of other seemingly at-risk students on numerous prior occasions throughout her teaching career. But before plaintiff could do so, the Female Child herself "beat plaintiff to the punch". Following a virtual class on December 14, 2020, the Female Child requested a private meeting with plaintiff. The two met via Zoom the following day, Wednesday, December 15, 2020, during plaintiff's regularly scheduled office hours (the "December 15 Meeting").

121.   At the December 15 Meeting, the Female Child informed plaintiff that she was reaching out because she saw in plaintiff a sympathetic and compassionate person in whom she could confide about personal matters at a time when she was in crisis. The Female Child then proceeded to share with plaintiff many of the personal issues that were troubling her. These included, without limitation, the Female Child's poor academic performance under the new COVID protocols, her low self-esteem, and various other personal insecurities and social anxieties.

122.   At the December 15 meeting, the Female Child also confided to plaintiff that she had begun to receive unsolicited information concerning LGBTQ issues on her Baird Google

31

account "suggestion feed" – a feature the School provided whereby students received from YouTube on their Google Chromebooks so-called "you might like" notifications, followed by a selection of videos. The Female Child informed plaintiff that after viewing these materials, she found herself questioning whether she might be attracted to girls as well as to boys, and, in general, went on to describe her confusion over what plaintiff interpreted as "gender identity issues". The Female Child stated to plaintiff: "I know I need help" but "I don't know how to get it". When plaintiff suggested some form of professional counselling in the area of gender identity, the Female Child told plaintiff that she thought "that would be a good idea".

123.    As the December 15 Meeting concluded, the Female Child mentioned to plaintiff that she felt embarrassed speaking to her parents about this particular subject. As plaintiff was somewhat acquainted with the parents of the Female Child - the Father works as an auto mechanic and had over the years serviced plaintiff's vehicle - plaintiff offered to serve as an intermediary and to speak to the parents about the gender identity issues troubling the Female Child. The latter readily and gratefully accepted plaintiff's offer.

124.    Before plaintiff could reach out to the parents, she and three (3) other Baird teachers attended a CPT (Common Planning Time) meeting on the following day, December 16, 2020. At that CPT meeting, several at-risk students, were discussed, including the Female Child. At least two (2) of the teachers at that meeting voiced concerns similar to those of plaintiff about what they too had observed in the Female Child: her conspicuous sadness, depressed affect, declining academic performance, and overall poor self-image. All four (4) teachers present at the CPT agreed that the Female Child's parents should be notified of these concerns. It was decided that plaintiff should be the one to approach the parents, in part because of her prior relationship with them, and in part because during plaintiff's December 15 Meeting with the Female Child,

32

the latter had expressly asked plaintiff do so.

125.    As a result, later that day plaintiff had a telephone conversation with the mother of the Female Child (the "Mother") and conveyed her own and some of the other teachers' concerns about the Female Child's depression and overall mental and emotional health. Plaintiff also informed the Mother about the Female Child's confusion over her gender identity as disclosed to plaintiff by the Female Child at the December 15 Meeting. In that telephone call, the Mother expressed her gratitude to plaintiff for the valuable line of communication that had been established, shared with plaintiff certain deeply personal information about herself as well as the Female Child, and indicated that she would undertake to obtain counseling for her daughter with a professional counselor recommended by plaintiff.  Later, plaintiff memorialized her telephone call with the Mother on a spreadsheet maintained by the School's Mariners Team to track communications with parents.

126.    On December 21, 2020 the Mother composed and transmitted an email (the "December 21 Email") to several of the School's teachers and staff, including defendants Gazda and Monette. In the December 21 Email, the Mother informed the recipients of the parents' desire to address the Female Child's gender identity questions and other mental health issues as a family and with professional help. The Mother requested that the recipients not have private conversations with the Female Child regarding these matters. The full text of the December 21 Email reads as follows:

> "Good evening,
>
> I am writing in regards to my daughter [name redacted]. It has been brought to the attention of both Stephen [the Female Child's father] and myself that some of [the Female Child's] teachers are concerned with her mental health.

33

I appreciate your concern and would like to let you know that her father and I will be getting her the professional help she needs at this time… With that being said, *we request that you do not have any private conversations with [the Female Child] in regards to this matter*. Please allow us to address this as a family and with the proper professionals." [Emphasis supplied.]

Thank you in advance with [*sic*] your concern to this matter.

Sincerely,

[Name of Mother redacted]" [Emphasis supplied.]

127. To date, the Mother has yet to receive a reply to the December 21 Email either from the School or from any of the recipients to whom it was addressed and distributed.

128. Also on December 21, the Mother telephoned plaintiff to ask whether the latter would be willing to work after school hours with the Female Child on activities, creative projects, and extra help with coursework in order to keep the Female Child occupied and engaged until counselling began in late January. Plaintiff readily agreed to do so.

129. Accordingly, beginning on January 4, 2021 and continuing through January 27, 2021, the Female Child met regularly, remotely, and privately after school with plaintiff via Google Meeting. In addition to serving as a mentor and tutor, plaintiff collaborated with the Female Child on a variety of creative projects, including: the design and construction of a plant hanger, macrame, chia pets, and vision boards.

130. Throughout this period, at the request of both the Female Child and her parents, plaintiff was in regular contact with the latter in order to apprise them of all aspects of their daughter's mental and emotional condition - including those pertaining to gender identity - and to keep them abreast of the improvement the Female Child was demonstrating in all areas as a result of the Female Child's extracurricular interactions with plaintiff. At all times the Female

34

Child was aware of plaintiff's frequent communication with her parents, and she approved of those communications.

131.    Plaintiff was not the only one in frequent communication with the Female Child during this period. Despite the parental requests made in the December 21 Email, and notwithstanding the fact that defendants had few, if any, professional qualifications in the area of child psychiatry and child development, defendants and their agents were in regular contact with the Female Child regarding the latter's struggles with gender identity.

132.    On Sunday afternoon, February 28, 2021, the Female Child transmitted an email (the "Female Child Email") to over a dozen School staff, including plaintiff and defendant Foley, the School's Grade Six School Counselor, announcing that she was "genderqueer". The full text of that Female Child Email, purportedly authored spontaneously by an eleven (11) year-old without adult prompting or guidance, reads as follows:

> "Hello everyone,
> If you are reading this you are either my teacher or guidance
> counselor. I have an announcement to make and I trust you guys
> with this information, [*sic*] I am genderqueer. Basically, it means I
> use any pronouns (other than it/its). This also means I have a name
> change. My new name will be R, [*sic*] please call me by that name.
> If you deadname me or use any pronouns I am not comfortable
> with I will politely tell you. I am telling you this because I feel like
> I can trust you. A list of pronouns you can use are [*sic*]: she/her
> he/him they/them fae/fear ae/aer ve/ver xe/xem ze/zir. I have added
> a link so you can look at how to say them, [*sic*] please only use the
> ones I have listed and no other ones. I do not like them.
> Thank you for your time.
> R [last name omitted]"

133.    The Female Child Email neither characterizes as confidential its various disclosures – including the disclosure that the Female Child is "genderqueer" - nor does it instruct the numerous recipients to avoid sharing the email or its contents with the Female

Child's parents.

134.     The next morning, Monday, March 1, 2021, Foley met alone with the Female Child, in apparent violation of the parents' requests made to the School in the December 21 Email. *See* ¶126. Foley then transmitted an email to the Female Child (the "Foley Email") on which eight (8) other teachers at the School, including plaintiff, were copied. The full text of the Foley Email, setting forth a strategy embraced by all defendants, reads as follows:

> "Thank you [name redacted] for sharing such an important piece of yourself with us.
>
> I'm going to share with your teachers what we had talked about today.
>
> [Name redacted] is open to the long list of pronouns that she provided but she PREFERS He/They. He understands that there will be times that she/her slips out and he is fine with that.
>
> [Name redacted] is still in the process of telling his parents and is requesting that school staff refer to him as [name redacted]  and use she/her pronouns with her parents and in written emails/letters home. When [name redacted] has informed his parents of his preferred name and pronouns, we will change the name in the computer system if that is what he wishes to do at that time.
>
> I explained to him that we understand this is a complicated process and we will be as supportive as possible - but may make mistakes from time to time.
>
> Thank you all, Baird is an amazing place to be.
>
> Marie Foley"

135.     As with the Female Child Email, the Foley Email did not expressly characterize any of the information that was conveyed by the Female Child (and shared with no fewer than a dozen Baird teachers), and, incidentally, shared by Foley with eight (8) more teachers, as

"confidential". Nor did the Foley Email set forth any prohibitions on its further dissemination to third parties, much less to the parents of the Female Child. Further, the Foley Email did not reference any School rule, regulation, policy, or guideline that might inform, much less prohibit, further dissemination. [20]

136.    What the Foley Email *did* do was set in motion a dishonest and corrupting stratagem concocted by defendants (and previously deployed by them in similar circumstances involving other Baird students – *see infra,* ¶137)  whereby an eleven (11) year-old Female Child, together with members of the Baird staff, would collude in a duplicitous charade designed to conceal from the Mother and the Father, but to reveal to everyone else, the perilous, gender-questioning odyssey upon which that Female Child was purportedly embarked. Put another way, the Foley Email prescribed both to the eleven (11) year-old Female Child and to the adult recipients a deceitful double life: all were to present the Female Child as a female student to her parents, but as a male student to rest of the School community.

137.    The Foley Email was not the only attempt by defendants to deceive parents. A short time after the Foley Email was transmitted, defendant Foley, addressing the case of a *second* female student at Baird experiencing gender identity issues, sent a similar email to School staff that read as follows:

> "Hi all,
>
> [Female birth name] has a preferred name of Michael/Mike and preferred pronouns of he and his. He understands that there will be times that "[female birth name]" and "she/her" slips out and he is fine with that.
>
> *Michael is still in the process of telling his parents and is requesting that school staff refer to him as [*female birth name*] and use she/her pronouns with her [sic] parents and in written*

---

[20] No such School rule, regulation, policy, or guideline, written or oral, then existed, nor, on information and belief, does one exist as of the date of this Complaint.

*emails/letters home.* When Michael has informed his parents of his preferred name and pronouns, we will change the name in the computer system if that is what he wishes to do at that time."

I explained to him that we understand this is a complicated process and we will be as supportive as possible – but may make mistakes from time to time.

Thanks,

Marie"  [Emphasis supplied.]

138.   In pursuing their duplicitous strategy, defendants struck at the sacred covenant between parents and their children. Perhaps worse, those who should be setting an example of honesty and integrity for their student charges did precisely the opposite. Perhaps worst of all, the dishonest activities of defendants traduced a principal canon of transgender counseling and one of the critical touchstones of trans liberation: "Own who you are."

139.   Two (2) days following the Foley Email, on Wednesday, March 3, 2021, plaintiff and eight (8) other teachers at Baird constituting the School's Mariners Team attended another CPT meeting. At that meeting, the Female Child Email was apparently discussed, although plaintiff was not present for those discussions, having left the meeting early to attend a doctor's appointment. During the portion of the CPT meeting when plaintiff was present, she recalls no discussion among the other attendees concerning the confidentiality of the Female Child Email or whether the Female Child's parents should or should not be notified of its contents.

140.   Baird had always encouraged communications between teachers, students, and their families; indeed, since 2013 the School had made communication with parents and families an important criterion of the teacher's bi-annual performance evaluations. *See supra,* ¶¶ 44, 45. But the School had never promulgated policies, guidelines, or instructions, written or otherwise, governing teacher communications with parents, much less prohibitions regarding parent-teacher

38

communications. Further, at all relevant times, no official district or School policy existed regarding use of student's preferred names or preferred pronouns when different from students' enrolled name or biological sex.

141.    Several days following the CPT meeting of March 3, 2021, plaintiff by chance encountered the Father while dropping off her automobile for repairs at the garage where the latter was employed. A conversation between the two ensued in which the Female Child, her performance in school, her overall well-being, and the progress she was making in counselling, was discussed. The conversation then turned to the older brother of the Female Child, whom plaintiff had taught the year before and whom she also considered to be at risk. At this point the Father confided to plaintiff that he had noticed on his son's Google Chromebook a disturbing email, purportedly authored by the son (the "Son's Email"), in which the son expressed doubts about his own gender identity. Stuck by the similarities of voice and language between Son's Email and the Female Child Email, plaintiff asked the Father whether he was aware of the recently-transmitted Female Child Email. When the Father replied in the negative, plaintiff shared with him the gist of the Female Child Email, as well as plaintiff's suspicion that someone other than the Female Child and the son had written both emails.

142.    Thus alerted, the parents of the Female Child contacted defendant Monette to request a meeting, upset not only by the contents of the Son's Email and the Female Child Email, but also by the fact that several of the defendants had violated the parents' request, contained in their December 21 Email, not to have private conversations with the Female Child in order that the issues she was facing could be addressed exclusively by the family and appropriate professionals.

143.    After some delay, a meeting between the parents and defendant Monette was at

last scheduled for March 16, 2021. But before that meeting could occur, a meeting between the Female Child and defendant Foley took place on March 15, 2021, during which the Female Child informed Foley that plaintiff had not only informed the Father of the existence of the Female Child Email but had shared with him plaintiff's suspicion that both it and the Son's Email had been authored by someone other than his two children. Defendant Foley promptly informed defendant Monette of these developments, who in turn informed defendant Gazda.

144.    Defendant Gazda's response was to direct defendant Monette and Attorney Bouchard to conduct an investigation to determine how so-called "confidential information" (*i.e.,* the Female Child Email that had been disseminated to over a dozen adults and an as-yet undetermined number of students), came to be disclosed to the parents of the Female Child, purportedly against her "express" wishes.

### E.  Defendants' Retaliation Against Plaintiff and Plaintiff's Termination

145.    For a period of two (2) weeks Ms. Manchester heard nothing from the School concerning the Female Child, nor was she expecting to. Then, on Friday, March 19, 2021, following the end of the school day, plaintiff received a letter from defendant Monette delivered electronically (the "March 19 Letter") notifying plaintiff that she was being placed on paid administrative leave "effective immediately for conduct unbecoming a teacher related to your inappropriate communications with the parents of a student." A copy of the March 19 Letter is attached hereto as Exhibit B.

146.    In the March 19 Letter, defendant Monette cited no law, no regulation, no School rule or policy, nor any other objective standard as grounds for the School's decision. The March 19 Letter concluded by stating that defendant Monette would be contacting plaintiff "to schedule an interview as part of the investigation into this matter" and that "this meeting may result in

disciplinary action". Ex. B.  Although the March 19 Letter made no reference to other punitive actions by the School, simultaneously with their transmission of the March 19 Letter defendants also blocked plaintiff's access to her School email and other records, electronic and hard copy.

147.    At the time plaintiff received the March 19 Letter, the investigation ordered by defendant Gazda had not yet begun, nor had anyone connected with the School asked plaintiff for her side of the story regarding her allegedly "inappropriate communications with the parents of a student" that purportedly rose to the level of "conduct unbecoming a teacher".

148.    On March 23, 2021, four (4) days after plaintiff was placed on administrative leave, the School began the investigation ordered by defendant Gazda, with defendant Monette and Attorney Bouchard interviewing all but one of the Baird staff members who constituted the Mariners Team.[21] The one not interviewed that day was Ms. Manchester. All interviewed denied having any communication whatsoever with the parents of the Female Child, much less communications concerning the contents of the Female Child Email.[22]

149.    Two days later, on March 25, 2021, plaintiff, represented by her then counsel, was interviewed via Zoom by defendant Monette and Attorney Bouchard (the "March 25 Interview"). Although blindsided by the March 19 Letter and denied access by the School to all her records, plaintiff answered in good faith every question posed to her by Attorney Bouchard and defendant Monette.

150.    Following the March 25 Interview, defendants, apparently needing more, caused Monette to send a second letter to plaintiff dated April 6, 2021 (the "April 6 Letter"), on which defendant Gazda was copied. That letter requested that plaintiff make herself available for a *second* interview on April 8, 2021 (the "April 8 Interview"). The April 6 Letter reiterated that,

---

[21] The Mariners Team included plaintiff and eight (8) other teachers and staff.
[22] In her interview with defendant Monette and Attorney Bouchard, defendant Foley actually denied ever having received the parents' December 21 Email. *See* ¶126.

like the March 25 Interview, the April 8 Interview was "regarding an investigation into conduct unbecoming a teacher related to your inappropriate communications with the parents of a student." A copy of the April 6 Letter is attached hereto as Exhibit C.

151.    The April 8 Interview was held virtually, with defendant Monette, Russell J. Dupere, Esq., counsel for the District, plaintiff, and plaintiff's successor counsel participating.

152.    Despite the fact that defendants characterized both the March 25 Interview and the April 8 Interview as "investigative", requests by plaintiff and her counsel that Baird provide plaintiff with (i) more detailed information concerning the scope of the School's investigation, (ii) the nature of plaintiff's allegedly "inappropriate" conduct, and (iii) access to her files and School computer, all so that she might better prepare for the interviews rendering them more fruitful, were denied by defendants.

153.    As she had during the March 25 Interview, plaintiff answered fully and in good faith every question posed to her by Attorney Dupere and defendant Monette during the April 8 Interview. Unfortunately, the good faith of Ms. Manchester was not reciprocated by defendants.

154.    Instead of a collaborative search for truth, the April 8 Interview devolved into a hostile, hour-long inquisition by Attorney Dupere, who posed to a witness relying entirely on memory (because denied access to her records) a series of inexpertly framed and obfuscatory questions, designed less to uncover the truth than to confuse plaintiff, trip her up on small details, and make her appear evasive and unforthright.

155.    The reason underlying the School's strategy was painfully obvious: aware that their vague and standard-less articulation of Ms. Manchester's alleged "misconduct" ("conduct unbecoming of [*sic*] a teacher", *see* Ex. B and Ex. D) was so dangerously thin, unjust, unconscionable, and evidence-free as to fail the smell test, defendants scrambled desperately

during the April 8 Interview to buttress their bogus claim by attempting to generate, synthetically, additional grounds upon which a termination of plaintiff might be based.

156. One technique deployed by Attorney Dupere during the April 8 Interview was to conflate, whether by inadvertence or design, the Female Child Email with the Foley Email. Where Attorney Bouchard's questioning during the March 25 Interview had ignored the Female Child Email entirely and focused exclusively and unambiguously upon the Foley Email (*see infra,* ¶159), Attorney Dupere's questioning of plaintiff during the April 8 Interview appears to have encompassed both; but in the actual framing of his questions to plaintiff, Attorney Dupere failed clearly to differentiate between the two, referring both to the Female Child Email and the Foley Email as "the email".

157. Thus confusingly commingled, some of Attorney Dupere's questions about the one were answered by plaintiff with reference to the other. The result was a sloppy, ambiguous, and imprecise transcript. Yet defendants, in their desperation, nonetheless later seized upon it as providing evidence of Ms. Manchester's untruthfulness. It did no such thing. Were the FBI during an interrogation in a criminal investigation to deploy such a patently dishonest and ham-handed stratagem, it would readily be seen for what it was: a process crime "perjury trap", more indicative of the bad faith of the examiner than the mendacity of the examined.

158. Defendant's sensitivity, particularly concerning the Foley Email, was on full display a week following the April 8 Interview (and nearly three (3) weeks following the March 25 Interview) when Attorney Bouchard summarized her recollections of the *March 25 Interview only* in a memorandum dated April 15, 2021 addressed to defendant Gazda (the "April 15 Memorandum"). Although totally silent regarding the April 8 Interview (that Attorney Bouchard did not attend), the April 15 Memorandum records that at the outset of the March 25 Interview

43

Attorney Bouchard had advised plaintiff as to the scope of the investigation as follows:

> "Ms. Manchester was told that we were looking into the dissemination of confidential information shared by a student with this team of teachers that was subsequently disclosed against the express wishes of the student."

159.    The April 15 Memorandum goes on to reveal that the focus of the interrogation of plaintiff during the March 25 Interview had not been on the Female Child Email but exclusively on the Foley Email. The April 15 Memorandum records that plaintiff had been asked: (i) "whether she had received an email from Marie Foley on March 1" [*i.*e., the Foley Email] (after her memory was refreshed, plaintiff acknowledged that she had); (ii) "whether she had shared [the Foley Email] or the contents of it with anyone outside of the group of teachers who had received it" (other than her "monitor", plaintiff stated that she had not); (iii) whether she had any communications with the parents of the Female Child during the school year (plaintiff acknowledged contacting the Mother following the CPT meeting on December 16, 2020 – *see supra,* ¶125); and (iv) whether she had contacted the parents on any other occasion (the Memorandum records that plaintiff replied in the negative). Most tellingly, when asked by plaintiff's then counsel what was the information that had been allegedly "inappropriately" disclosed, the April 15 Memorandum records that Attorney Bouchard replied as follows: "I reiterated that it was the information in *the email from Marie Foley* [i.e., the Foley Email]".

160.    Following the April 8 Interview, a full seven (7) weeks passed before Ms. Manchester received any communication from defendants. Then, in a letter to plaintiff dated May 19, 2021 (the "May 19 Letter) that cited an unwritten and previously unarticulated (much less enforced) policy that purportedly prohibits teachers from communicating to the parents of their students about any matter relating to their children's gender identity, defendant Monette, informed plaintiff that "I have decided to terminate your employment with the Ludlow Public

44

Schools due to [*sic*] conduct unbecoming of [*sic*] a teacher." A copy of the May 19 Letter is attached hereto as Exhibit D.

161.    The May 19 Letter asserted three (3) specific grounds for termination:

First, that plaintiff had shared "sensitive confidential information about a student's expressed gender identity against the wishes of the student, the direction of the Guidance Counselor, and in contradiction to DESE guidance";[23]

Second, that plaintiff had been "untruthful numerous times during the investigation of this matter"; and

Third, that plaintiff had "violated state law and regulations regard [*sic*] student records/privacy as well as the Family Educational Rights and Privacy Act (FERPA)".

162.    None of the three grounds asserted in the May 19 Letter as the basis for terminating plaintiff is supported by the facts giving rise to, or the law governing, this case.

163.    Plaintiff had not "shared sensitive information about a student's expressed gender identity against the wishes of the then eleven (11) year-old student". To the contrary, plaintiff had shared that information with the Female Child's parents at the express request and with the permission of the student/Female Child, permission that the Female Child to this day has never revoked. But even had that not been the case, plaintiff's conduct still would not have been valid grounds for her termination.

---

[23] Following enactment of An Act Relative to Gender Identity (Chapter 199 of the Acts of 2011), that became effective on July 1, 2012 and amended several Massachusetts statutes to prohibit discrimination on the basis of specified categories, including gender identity, the Department of Elementary and Secondary Education of the Commonweealth of Massachusetts ("DESE") promulgated guidance entitled "Guidance for Massachusetts Public Schools Creating a Safe and Supportive School Environment" (the so-called "DESE guidance") to assist schools in implementing the gender identity provisions of the new Act. The DESE guidance is accessible through the following link: https://www.doe.mass.edu/sfs/lgbtq/GenderIdentity.html.

164.    Nor had plaintiff "shared sensitive information" against "the direction of the Guidance Counselor", defendant Foley. As in the case of the School, Foley had promulgated no such direction, instructions, or guidance, written or oral; and even if she had, plaintiff would not be bound by such a direction from one lacking the necessary authority; and even if she were, disregard of such a direction in the circumstances of this case would hardly amount to "conduct unbecoming a teacher".

165.    In addition, far from being "in contradiction to DESE guidance" as defendants asserted, plaintiff's sharing with the then eleven (11) year-old Female Child's parents "sensitive confidential information about a student's [the Female Child's] expressed gender identity" was in fact entirely *consistent* with the DESE guidance. It was actually defendants, by their deceitful strategy of keeping parents in the dark about their children's gender identity (embarrassingly laid bare in the Foley Email), who were "in contradiction to DESE guidance" that, at all relevant times read in pertinent part as follows:

> "The responsibility for determining a student's gender identity rests with the student *or, in the case of young students not yet able to advocate for themselves, with the parent.*"[24]
>
> ***
>
> When determining which, if any, staff or students should be informed that a student's gender identity is different from the assigned birth sex, decisions should be made in consultation with the student, *or in the case of a young student, the student's parent or guardian*.[25] [Emphasis supplied.]

166.    While the DESE guidance provides no definition of the term "young student", the age of fourteen (14) supplies the line of demarcation in the DESE guidance for determining

---

[24] *See* DESE guidance, p. 2, accessible at https://www.doe.mass.edu/sfs/lgbtq/GenderIdentity.html.
[25] *Id.*, p. 4.

when absolute parental authority yields to that of the student for purposes of consenting to the disclosure of student record information:[26]

> "Transgender and gender nonconforming students may decide to discuss and express their gender identity openly and may decide when, with whom, and how much to share private information. A student who is 14 years of age or older, or who has entered the ninth grade, may consent to disclosure of information from his or her student record. *If a student is under 14 and is not yet in the ninth grade, the student's parent (alone) has the authority to decide on disclosures and other student record matters.*" [Emphasis supplied.]

167.   Contrary to defendants' second false assertion in the May 19 Letter, plaintiff was not "untruthful numerous times during the investigation of this matter". Rather, plaintiff cooperated fully with the School during its investigation, voluntarily making herself available for questioning by defendant Monette and School counsel on two separate occasions, despite the stress and inconvenience entailed. During the March 25 Interview and the April 8, Interview, plaintiff was forthright and forthcoming, answering to the best of her memory and ability *all* questions posed to her without resort to obfuscation, memory lapses, or other stratagems of evasion. Further, plaintiff's cooperation and good faith continued, even after asking for, and being refused, access to her School records in order to refresh her recollection of events and sharpen her testimony. By contrast, the admixture of obduracy, treachery, bad faith, dishonesty, and cunning deployed by defendants and their agents in their interrogation and charging of plaintiff rivaled the techniques employed by *apparatchiks* of the KGB in the former Soviet Union.

---

[26] Under Massachusetts law (*see* 603 CMR 23.00), a student's record includes information about a student's birth name, name change for gender identity purposes, gender transition, medical or mental health treatment related to gender identity, and otyher ionformation of a similar nature. *See also*, DESE guidance, p. 4, accessible at https://www.doe.mass.edu/sfs/lgbtq/GenderIdentity.html.

168.    Lastly, plaintiff violated no state or federal laws or regulations regarding privacy of student records, and defendants' false assertion that she released "student information to individuals who did not have the right to view the information" is without legal or factual foundation.

169.    When reduced to its essence, the position of defendants rests upon the following absurdity: plaintiff must be (and was) punished for meeting, not on School grounds but on private property, and speaking with the Father of an at-risk eleven (11) year-old Female Child regarding the gender identity of their child in circumstances where (i) plaintiff had enjoyed a preexisting, months-long rapport with the Female Child in which the latter had confided in plaintiff about a host of personal issues including the Female Child's gender identity; (ii) at the request of the Female Child, plaintiff had initiated a preexisting, months-long dialogue with the parents of the Female Child concerning the child's gender identity resulting in the Female Child being enrolled in a course of professional counseling; (iii) the parents of the Female Child had an absolute legal right to know the information conveyed to them by plaintiff; (iv) plaintiff had an absolute legal right to express that information to the parents of the Female Child; (v) the freedoms of association and speech were exercised by plaintiff not on School grounds but on private property; (vi) neither the parents nor the Female Child has complained to plaintiff or to defendants about plaintiff's conduct;[27] (vi) nothing in the record suggests the sort of parental dysfunctionality that would result in harm to the Female Child as a result of plaintiff's conduct; and (vii) plaintiff has and continues to have the complete and enthusiastic support of both parents and the Female Child.

---

[27] To the contrary, it was the at-risk child who initially approached plaintiff in December of 2020 seeking the latter's assistance in communicating with her parents, not the other way round. *See* ¶123. As for the parents themselves, in a letter to Principal Monette dated May 5, 2021 they lauded Ms. Manchester for providing them the information about their eleven (11) year-old daughter, the Female Child, that was the alleged basis for plaintiff's termination by the School.

170.    Plaintiff believes that teachers have a duty and a responsibility to inform parents of issues that could affect their children's mental, emotional, and spiritual wellbeing, including, without limitation, issues relating to gender identity.

171.    Plaintiff also believes that for a teacher to assist an eleven (11) year-old student in deceiving that child's parents would constitute not only a grave moral wrong but also provide a harmful and immoral example to that student.

172.    If the student were under fourteen (14) years of age, the DESE guidance would require defendants to provide to the parents, with or without the student's consent or knowledge, copies of a student's school records related to the student's gender identity and preferred name and pronouns were they to request such information.

173.    Similarly, if the student were under fourteen (14) years of age, the DESE guidance would require defendants to reveal to the student's parents, with or without the student's consent or knowledge, that student's gender identity and preferred name and pronouns were the parents to request such information.

## V. CLAIMS FOR RELIEF

### COUNT I

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

174.    Plaintiff realleges each of the allegations set forth in paragraphs 1 through 173 of this Complaint as if fully set forth herein.

175.    At all relevant times, defendants knew that plaintiff suffered from a disability.

176.    Even had plaintiff not suffered from a disability, or even if she had and defendants had not known it, the conduct of defendants was extreme and outrageous.

49

177.    Defendants intended to inflict emotional distress on plaintiff, or they knew or should have known that the foreseeable result of their actions or their failures to act would be the infliction of severe emotional harm on plaintiff.

178.    Given that plaintiff did suffer from a disability, the conduct of defendants was beyond all possible bounds of decency and utterly intolerable in a civilized community.

179.    The conduct of defendants caused plaintiff to suffer emotional distress. The emotional distress of plaintiff was severe and of a nature that no reasonable person could be expected to endure it and plaintiff was unable to endure it.

180.    Defendants' conduct has caused plaintiff to suffer damages including, but not limited to, lost income and other economic harm, restrictions on her rights of freedom of expression and association, damage to her professional reputation and personal standing in the community, and aggravation of her preexisting medical conditions, in an amount to be determined at trial.

## COUNT II

### CIVIL CONSPIRACY

181.    Plaintiff realleges each of the allegations set forth in paragraphs 1 through 180 of this Complaint as if fully set forth herein.

182.    Defendant Funke's introduction of sexualized and age-inappropriate books, media and other materials into the Baird library had created an upsurge of tension and controversy within the Baird community sweeping into its vortex not only teachers and School administrators but also parents and School Board members. *See supra,* ¶ 52 *et seq*.

183.    The crescendo reached a climax in the Spring of 2017 when plaintiff discovered that defendant Funke had provided students in plaintiff's sixth (6th) grade Ancient History class

with inappropriate animated videos depicting sexual activity that was explicit, aberrant, and grossly inappropriate for children of that age. *See supra,* ¶¶ 65, 66.

184. Alerted by that incident to the serious problem of sexualized and age-inappropriate books and media being introduced into the Baird School library, plaintiff from that point forward began playing a leading role on behalf of parents and fellow teachers at Baird in demanding that defendants take steps to remove the objectionable material. *See supra,* ¶¶ 65 *et seq*.

185. Among other activities, plaintiff not only spoke out boldly and repeatedly against the offensive materials, but also strove tirelessly to hold defendants accountable for their reluctance, refusal, and inability to demonstrate leadership on this issue, to the point where, by the Fall of 2019, defendants Funke, Monette, Gazda and others saw plaintiff not only as a "hair shirt" but as a dangerous adversary who must be neutralized because of the "waves" she was making among parents, other teachers, members of the School staff, and, most frightening to defendants, members of the School Committee.

186. As a result, the many "ganged up" against the one. Defendants, in combination, put in motion a series of concerted actions by illegal means, overt and covert, for the unlawful purposes of marginalizing and diminishing plaintiff's personal and professional standing and reputation in the Baird community, and ultimately terminating her employment with the School.

187. The conspiracy against plaintiff included, without limitation, the following overt acts: (i) the generation of a dishonest and unfair Final Evaluation covering plaintiff's performance during the period from 2017-2019 (*see supra,* ¶¶ 75, 76); (ii) instigating the preparation of the spurious Funke Complaint in January of 2020 (*see supra,* ¶¶ 93-97) that names defendants Monette and Gazda as witnesses and whose allegations, knowingly false when made,

remain unresolved over two and one-half (2.5) years after they were asserted; (iii) orchestrating the termination of plaintiff from her position as a teacher in the Ludlow School District based on the arbitrary, capricious, and theretofore unarticulated standard of "conduct unbecoming a teacher related to your inappropriate communications with the parents of a student." (*see supra,* ¶¶ 138-160); (iv) after placing plaintiff on administrative leave, denying her access to her School files and records while attempting to lure plaintiff into making false and inaccurate statements during the March 25 and April 8 Interviews (*see supra,* ¶¶ 150-157); and (v) once they had been maliciously and synthetically generated, citing the knowingly false allegations of "untruthfulness" as separate grounds for plaintiff's termination. *See supra,* ¶¶ 160, 167 and Ex. D.

188.    Each defendant engaged in the particular tortious activity knew that the conduct of the other defendants involved constituted a breach of duty, and each gave substantial assistance or encouragement to the others so to conduct themselves.

189.    Defendants' conspiracy against plaintiff resulted in plaintiff's termination from her twenty (20)-plus years position as an exemplary teacher in the Ludlow School District, and caused plaintiff to suffer damages including, but not limited to, lost income and other economic harm, severe emotional distress, restrictions on her rights of freedom of expression and association, damage to her professional reputation and personal standing in the community, and aggravation of her preexisting medical conditions, in an amount to be determined at trial.

## COUNT III

### VIOLATION OF PLAINTIFF'S FIRST AMENDMENT RIGHT
### OF
### FREEDOM OF SPEECH

### CONTENT AND VIEWPOINT DISCRIMINATION

**(42 U.S.C. § 1983)**

190. Plaintiff realleges each of the allegations set forth in paragraphs 1 through 189 of this Complaint as if fully set forth herein.

191. Plaintiff's views and expression of those views regarding gender identity is content protected by the First Amendment.

192. Plaintiff's communication with the Father concerning *the mere fact* of his daughter's email (the Female Child Email) addressing her gender identity was, *a fortiori*, constitutionally protected speech and expression exercised by Ms. Manchester in her capacity as a private citizen, after School hours, and outside School property.

193. Defendants' decision to terminate plaintiff's employment with the School was based on a fear that expression of the kind of views held by plaintiff would expose defendants' attempts to deceive parents regarding information that was critical to their children/student's upbringing and mental and emotional wellbeing.

194. By threatening to punish plaintiff for expressing her views, and then ultimately terminating her, defendants engaged in invidious and egregious viewpoint discrimination violative of the First Amendment and they attempted to justify their actions by claiming that plaintiff had violated a purely fictitious School policy of confidentiality that simply did not exist.

195. Defendants' conduct required plaintiff and other School teachers and administrators to evaluate the content and viewpoint of their speech regarding gender identity in order to determine whether it conforms to that permitted by the School.

196. Defendants considered the content and viewpoint of plaintiff's expression when they decided to place her on administrative leave and, later, to terminate her, and defendants threaten to do so again to other similarly situated teachers who express the same views.

197.    The impermissible conduct of defendants towards plaintiff chills the speech of similarly situated Baird teachers and administrators who seek to engage in protected expression and association in their interactions with parents of students both at the School and outside of School, and, ultimately degrades and cheapens the educational product offered by the School.

198.    Defendants' actions have violated plaintiff's right to freedom of speech and association as guaranteed by the First Amendment to the United States Constitution and have caused plaintiff to suffer damages including, but not limited to, lost income and other economic harm, severe emotional distress, restrictions on her rights of freedom of expression and association, aggravation of her preexisting medical conditions, damage to her professional reputation and personal standing in the community, and aggravation of her preexisting medical conditions, in an amount to be determined at trial.

199.    Defendants threaten to do the same in the future to similarly situated teachers and administrators who exercise their rights of freedom of speech and association.

## COUNT IV

### VIOLATION OF PLAINTIFF'S FIRST AMENDMENT RIGHTS
### OF
### FREEDOM OF SPEECH AND ASSOCIATION

### RETALIATION

### (42 U.S.C. 1983)

200.    Plaintiff realleges each of the allegations set forth in paragraphs 1 through 199 of this Complaint as if fully set forth herein.

201.    As a public employer and/or supervisor, defendants collectively had a duty to respect plaintiff's rights as a public employee to free speech and association under the First Amendment to the United States Constitution.

202.    Plaintiff's off-School grounds conversation with the Father of the Female Child was constitutionally protected speech and association. *See supra*, ¶ 141.

203.    When plaintiff communicated with the Father concerning the Female Child Email, *id*., she was doing so at the request of the Female Child (*see supra,* ¶ 123), in furtherance of conversations already begun with the Female Child and the Mother (*see supra,* ¶¶ 120-123, 125), speaking on a matter of public concern, engaging in speech related to teaching and scholarship, doing so off School property and on her own time, and engaging in the sort of core expression and association that the First Amendment protects.

204.    Plaintiff's communication with the Father concerning *the mere fact* of his daughter's email (the Female Child Email) addressing her gender identity was, *a fortiori*, constitutionally protected speech and expression exercised by Ms. Manchester in her capacity as a private citizen, after School hours, and off School property.

205.    Defendants' decision to terminate plaintiff's employment with the School was, at bottom, in retaliation for her views on gender ideology and based on a fear that expression of the views held by plaintiff would expose defendants' attempts to deceive parents regarding information that was critical to their children/student's upbringing and mental and emotional wellbeing.

206.    By punishing, then threatening to punish more severely, then ultimately terminating plaintiff for expressing her views regarding gender identity both in the classroom, on School property, and, in this case, on private property, defendants have retaliated against plaintiff and are continuing to retaliate against plaintiff for exercising her First Amendment rights.

207.    Plaintiff's interest as a teacher at Baird, a public school, in communicating in the context of teaching and scholarship with the parents of an at-risk eleven (11) year-old student on

subjects relating to the health and well-being of that student that are of public concern outweighs defendants' interest in banning communications from teachers to parents, even if, as was not the case here, the School's prohibition were based upon the wishes of the student.

208.    Plaintiff's exercise of core speech and association with the Father of the at-risk Female Child on subjects relating to the health and well being of that student that are of public concern never prevented defendants from efficiently providing services to the public or to the Female Child (or even threatened to do so).

209.    Defendants' actions, and their threatened future pursuit of these actions, would likely have a chilling effect on other School employees and deter a person of ordinary firmness from exercising his right to free speech and free association in the future.

210.    Defendants' conduct has violated plaintiff's rights of freedom of speech and association as guaranteed by the First Amendment to the United States Constitution and has caused plaintiff to suffer damages including, but not limited to, lost income and other economic harm, severe emotional distress, restrictions on her rights of freedom of expression and association, damage to her professional reputation and personal standing in the community, and aggravation of her preexisting medical conditions, in an amount to be determined at trial.

211.    Defendants threaten to do the same in the future to similarly situated teachers and administrators who exercise their rights of freedom of speech and association.

## COUNT V

### VIOLATION OF THE MASSACHUSETTS CIVIL RIGHTS ACT

### (Violation of Mass. Gen. L. Ch. 12, §§ 11I)

212.    Plaintiffs realleges each of the allegations set forth in paragraphs 1 through 211 of

this Complaint as if fully set forth herein.

213.    The Massachusetts Civil Rights Act authorizes a private plaintiff to seek compensatory damages and injunctive relief against anyone who interferes with the plaintiff's exercise of constitutional rights. The statute provides a cause of action as follows:

> [w]henever any person or persons, whether or not acting under color of law, interferes by threats intimidation or coercion, or attempts to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth.

Mass. Gen. Laws ch. 12, §§ 11H, 11I). To establish a claim under the act, "a plaintiff must prove that (i) the exercise or enjoyment of some constitutional or statutory right; (ii) has been interfered with or attempted to be interfered with; and (iii) such interference was by threats, intimidation, or coercion." *Courier v. Nat'l. Bd. of Med. Exam'rs*, 965 N.E. 2nd 829, 837-38 (Mass. 2012). Unlike its federal counterpart, 42 U.S.C. §1983, the Massachusetts Civil Rights Act does not require a party to show that a *government actor* deprive the plaintiff of a constitutional right. *Sena v. Commonwealth* 629 N.E.2nd 986, 993 (Mass. 1994).

214.    Defendants violated the Massachusetts Civil Rights Act by violating plaintiff's rights under the First and Fourteenth Amendments.

215.    As a public employer and/or supervisor, defendants had a duty to respect plaintiff's rights of free speech, association as a public employee under the First Amendment to the United States Constitution and Part I, Articles II and XVI of the Massachusetts Constitution.

216.    Defendants, through threats, intimidation, and coercion, including but not limited to: threatening and effecting substantial harm to plaintiff's future professional opportunities and professional reputation, sowing a culture of fear and intimidation in the Baird community, and

ultimately terminating plaintiff from her position as a teacher at Baird, interfered with plaintiff's exercise and enjoyment of her rights to free speech and association guaranteed by the United States and Massachusetts Constitutions.

217. Defendants' conduct has caused plaintiff to suffer damages including, but not limited to, lost income and other economic harm, severe emotional distress, restrictions on her rights of freedom of expression and association, damage to her professional reputation and personal standing in the community, and aggravation of her preexisting medical conditions, in an amount to be determined at trial.

## COUNT VI

## VIOLATION OF EQUAL PROTECTION

## (42 U.S.C. § 1983)

218. Plaintiff realleges each of the allegations set forth in paragraphs 1 through 217 of this Complaint as if the same were fully set forth herein.

219. For years teachers and administrators at the School, including plaintiff, had been communicating with parents of students on a wide variety of matters relating to their children's academic, physical, mental, and emotional well-being.

220. Far from being prohibited as "conduct unbecoming a teacher", such proactive parent-teacher communications were deemed an essential feature of the educational product that the School produced, so much so that they were enshrined as a vital criterion in every teacher's bi-annual personnel evaluation. *See supra,* ¶¶ 43-45.

221. Even though other similarly situated teachers and administrators at the School had regularly communicated with parents on all types of subjects - including those touching upon gender identity - none but plaintiff had his position at the School terminated, or faced any

58

disciplinary action by the School whatsoever, as a result of these constitutionally protected communications.

222.    Defendants arbitrarily, capriciously, and without a rational basis subjected plaintiff to discipline, and ultimately terminated her from her position at the School, simply because in a single constitutionally protected conversation with the Father of the Female Child touching upon a wide variety of subjects, plaintiff happened to mention a single email (the Female Child Email) purportedly authored by the Father's then eleven (11) year-old Female Child and transmitted to plaintiff and over a dozen other School staff in which the Female Child announced that she was "genderqueer". *See supra,* ¶¶ 132, 141.

223.    Defendants only disciplined and ultimately terminated plaintiff because she exercised her constitutionally protected rights of freedom of speech and association in a manner and from a point of view with which defendants disapproved.

224.    If plaintiff's allegedly prohibited conversation with the Father of the Female Child had been held with anyone other than a parent of that child, plaintiff would not have been disciplined, much less terminated, by the School. Conversely, if a similarly situated teacher holding views not disfavored by the School had held a conversation with the Father of the Female Child, that teacher would not have been disciplined, much less terminated, by the School.

225.    Defendants' selective and disparate treatment of plaintiff was based upon illegal considerations that included, without limitation: (i) an intent to prohibit plaintiff from exercising constitutionally protected rights of speech because she expressed viewpoints with which defendants disagreed; (ii) an intent to prohibit plaintiff from exercising constitutionally protected rights of association with groups disfavored by the school (i.e., parents); (iii) a desire to retaliate against plaintiff for expressing constitutionally protected speech disfavored by the School, most

especially for plaintiff's having objected to certain books that the School's former librarian was making available to children in the School; (iv) the School's false and irrational interpretation of the DESE guidance; and (v) the School's bad faith and malicious efforts retroactively to punish plaintiff based upon the invocation of a fictitious and non-existent School "policy" that purports to prohibit certain forms of communication between teachers and parents.

226.    By their conduct, defendants violated plaintiff's right to equal protection under the Fourteenth Amendment to the United States Constitution.

227.    Defendants' conduct has caused plaintiff to suffer damages including, but not limited to, lost income and other economic harm, severe emotional distress, restrictions on her rights of freedom of expression and association, damage to her professional reputation and personal standing in the community, and aggravation of her preexisting medical conditions, in an amount to be determined at trial.

## COUNT VII

### VIOLATION OF DUE PROCESS RIGHTS
### UNDER
### FOURTEENTH AMENDMENT

### (42 U.S.C. § 1983)

228.    Plaintiff realleges each of the allegations set forth in paragraphs 1 through 227 of this Complaint as if the same were fully set forth herein.

229.    Defendants' actions in subjecting plaintiff to punishment were not based on any Board-approved or official policies that addressed, much less prohibited, the conduct on which plaintiff was disciplined.

230.    Defendants' conduct in disciplining plaintiff and ultimately terminating her from her position at the School based upon a purported official "policy" that was never articulated

and, in fact, non-existent, constituted arbitrary and capricious conduct that abridged plaintiff's rights of freedom of speech and association and violated her right to due process of law under the Fourteenth Amendment.

231.    Defendants' conduct has caused plaintiff to suffer damages including, but not limited to, lost income and other economic harm, severe emotional distress, restrictions on her rights of freedom of expression and association, damage to her professional reputation and personal standing in the community, and aggravation of her preexisting medical conditions, in an amount to be determined at trial.

## VI.    GENERAL PRAYERS FOR RELIEF

WHEREFORE, plaintiff asks this Court for the following relief as to all counts:

A)  A declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §2201 that defendants have acted under color of law to deprive plaintiff of her First Amendment rights, in violation of  42 U.S.C. § 1983;

B) A declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §2201, that defendants have acted under color of law to deprive plaintiff of her Fourteenth Amendment right to equal protection of the laws in violation of 42 U.S.C. § 1983;

C) Declare that by the acts set forth in this complaint, and in violation of Mass. G.L. c. 12, §11I, defendants have interfered with plaintiff's exercise and enjoyment of her rights guaranteed by the First Amendment to the United States Constitution and Part I, Article II of the Massachusetts Constitution;

D) Declare that by the acts set forth in this complaint, defendants have unlawfully discriminated against plaintiff in violation of 42 U.S.C. § 2000e-2(a);

61

E) Enter a declaratory judgment pursuant to 22 U.S.C. § 2201 that the conduct of defendants is unconstitutional under the First and Fourteenth Amendments to the United States Constitution;

F) Declare that by the acts set forth in this complaint, and in violation of Mass. G.L. c. 149, § 185, defendants have unlawfully retaliated against plaintiff;

G) Enter a permanent injunction barring defendant Ludlow from implementing and enforcing any policy that prohibits teachers of students from communicating with parents of those students;

H) Order defendants to reinstate plaintiff to her former position with no loss of seniority or other rights that she enjoyed while employed by the School;

I) Enter judgment against defendants for money damages in the amount of ten million dollars ($10,000,000.00), or an amount to be determined at trial, whichever is greater;

J) Order defendants to pay plaintiff all her back salary, with statutory interest thereon, from May 19, 2021 through the date of the Order;

K) Order punitive damages assessed against defendants for the deprivation of plaintiff's rights under the United States and Massachusetts Constitutions;

L) Compensate plaintiff for three times her lost wages, benefits and other remuneration, and interest thereon, pursuant to Mass. G.L. c. 149, § 185(d)(4);

M) Award plaintiff costs and attorneys' fees, including those pursuant to 42 U.S.C. § 1988 and any other applicable legal authority, and interest; and

N) Award plaintiff such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff demands a trial by

jury in this action of all triable issues.

Respectfully submitted,

Plaintiff,
**Bonnie A. Manchester**
By her attorneys,
**McNamara & Associates**
**McLane & McLane, LLC**

Date: October 31, 2023

/s/ Frank L. McNamara, Jr., Esq.
Frank L. McNamara, Jr., Esq.
(BBO #339300)
McNamara & Associates
53 Wilder Road
Bolton, MA  01740
Tel: (978) 333-9608
Email: franklmcnamara@gmail.com


/s/ Ryan P. McLane, Esq.
Ryan P. McLane, Esq.
McLane & McLane, LLC
269 South Westfield Street
Feeding Hills, MA 01030
Tel: (413) 789-7771
Email: ryan@mclanelaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that this document will be served on the defendants in accordance with pursuant Fed. R. Civ. P. 4.


/s/ Ryan P. McLane, Esq.
Ryan P. McLane, Esq.
McLane & McLane, LLC
269 South Westfield Street
Feeding Hills, MA 01030
Tel: (413) 789-7771
Email: ryan@mclanelaw.com