UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BONNIE MANCHESTER,

       Plaintiff,

       v.

TOWN OF LUDLOW, et al.,

       Defendants.

Civil Action No. 23-30117-MGM

MEMORANDUM AND ORDER REGARDING
DEFENDANTS' MOTION TO DISMISS
AND MOTION TO STRIKE
(Dkt. No. 18)

April 25, 2025

MASTROIANNI, U.S.D.J.

## I. INTRODUCTION

This case arises out of Bonnie Manchester's ("Plaintiff") May 2021 dismissal from her position as a teacher at Paul R. Baird Middle School in Ludlow, Massachusetts. Following her termination, Plaintiff initiated this civil action against the Town of Ludlow, Todd H. Gazda, Stacey Monette, Maire-Claire Foley, and Jordan Funke.[1]

Plaintiff's claims sound in both federal and state law. Relying on 42 U.S.C § 1983, Plaintiff's federal claims allege Defendants Gazda, Monette, and Ludlow engaged in content and viewpoint discrimination thereby violating the First Amendment to the United States Constitution (Count III), retaliated against her for exercising her First Amendment rights (Count IV), denied her the equal protection of the laws as secured by the 14th Amendment (Count VI), and deprived her of her right

---

[1] At the time, Gazda was superintendent of Ludlow public schools. Monette was the principal of Baird. Foley was a guidance counselor at Baird. Funke was formerly the school librarian.

to procedural and substantive due process also secured by the 14th Amendment (Count VII). Plaintiff's state law claims allege Defendants Gazda, Monette, Foley, and Funke intentionally inflicted emotional distress (Count I), engaged in an unlawful civil conspiracy (Count II), and violated the Massachusetts Civil Rights Act (Count V).

In response, Defendants moved to dismiss the operative complaint for failure to state a claim upon which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6). As relevant to this order, Defendants argue Plaintiff's federal claims are not cognizable constitutional violations. Defendants further assert Plaintiff's complaint contains numerous paragraphs which constitute gratuitous and legally unnecessary attacks on the character of Defendant Funke, thereby justifying an order striking the objectional content from the complaint pursuant to Fed. R. Civ. P. 12(f).

For the following reasons, the court concludes Plaintiff's federal causes of action fail to state a claim upon which relief may be granted. These federal claims are therefore dismissed. Absent a viable federal claim to support subject matter jurisdiction, the court declines to exercise supplemental jurisdiction over Plaintiff's ancillary state law claims, rendering them dismissed without prejudice. Lastly, in view of the foregoing, Defendants' motion to strike is denied as moot.

## II.    BACKGROUND[2]

Baird Middle School serves students in grades six through eight living in Ludlow, Massachusetts. (Dkt. No. 9, ¶ 26.) Plaintiff began teaching at Baird in the fall of 1999. (*Id.* ¶ 27.) Plaintiff was a popular teacher, well-liked by both her students and their parents. (*Id.* ¶¶ 27-32.) She demonstrated an aptitude for working with children deemed "at-risk" because of emotional or behavioral issues which could substantially impair their learning experience. (*Id.* ¶¶ 29-35.)

In the fall of 2020, Plaintiff was assigned to teach a sixth-grade history class. (*Id.* ¶ 114.) This

---

[2] All factual allegations are drawn from Plaintiff's amended complaint and the exhibits annexed thereto. (Dkt. Nos. 9, 9-1, 9-2, 9-3, and 9-4.)

class contained approximately a dozen students and was conducted remotely because of the COVID pandemic. (*Id.*) Plaintiff, like other teachers at Baird, noticed significant behavioral and learning issues among the student body; these issues were attributed to the pandemic and distance learning. (*Id.* ¶ 115.) One of these children, an eleven-year-old, who was born biologically female ("B.F."), caused Plaintiff particular concern. (*Id.* ¶¶ 116-117.)[3] B.F. had previously "always displayed good work habits and was bright, well-adjusted, academically successful, and personable." (*Id.* ¶ 117.) Throughout the fall semester, however, Plaintiff observed the child's behavior "reflect[ed] a depressed demeanor, social detachment, and a marked decline in academic performance characterized by a failure to hand in assignments, poor grades, and a diminished work ethic." (*Id.*) Plaintiff initially contemplated contacting B.F.'s parents, but before she could do so, B.F. requested a one-on-one meeting with Plaintiff in December of 2020. (*Id.* ¶ 118.)

At this meeting, B.F. described suffering from low self-esteem, depression, and social anxiety. (*Id.* ¶ 119.) B.F. further revealed she was questioning her gender identity, but B.F. did not know how to express these questions to her parents. (*Id.* ¶¶ 120-21.) As Plaintiff was familiar with B.F.'s father through his role as an automobile mechanic, she suggested that she would act "as an intermediary and to speak to the parents about the gender identity issues troubling" B.F. (*Id.* ¶ 121.) B.F. accepted the offer. (*Id.*)

Before contacting B.F.'s family, Plaintiff attended a meeting with other Baird teachers to discuss multiple at-risk children, including B.F. (*Id.* ¶ 122.) Two other meeting attendees shared Plaintiff's concerns regarding B.F., and all four meeting attendees felt it was appropriate to contact B.F.'s parents. (*Id.*) Plaintiff subsequently called B.F.'s mother and notified her of the concerns. (*Id.* ¶

---

[3] For clarity and to protect the child's identity, the court will use the child's initials, B.F. The court is aware of the child's initials because it presided over a related case brought by the child's parents against a similar array of Defendants. *See generally Foote v. Town of Ludlow,* No. CV 22-30041-MGM (D. Mass.).

123.) In this conversation, Plaintiff expressly indicated B.F. was questioning her gender identify. (*Id.*)

Shortly after the call, B.F.'s mother emailed multiple Baird teachers and staff, including Defendants Gazda and Monette, requesting no further conversations occur with her child regarding mental health or gender issues. (*Id.* ¶ 124.) B.F.'s mother separately contacted Plaintiff to ask if she would be willing to work outside of school hours with B.F. (*Id.* ¶ 126.)  Plaintiff agreed to help. (*Id.*) She understood her role as two-fold: (i) collaborate with B.F. on various creative projects and (ii) provide information to B.F.'s parents regarding B.F.'s mental health and gender related questions. (*Id.* ¶¶ 127-28.)

In February 2021, B.F. sent several teachers and staff (including Plaintiff and Defendant Foley) an email indicating B.F. now used a new name, planned to identify using alternate pronouns, and was "genderqueer." (*Id.* ¶¶ 130-31.) Defendant Foley then met with B.F., before sending an email to several of B.F.'s teachers (including Plaintiff) requesting they adhere to B.F.'s requests. (*Id.* ¶ 132.) This email indicated B.F.'s preferred pronouns were he/they, but also asked that staff continue to use she/her pronouns when communicating with B.F.'s parents. (*Id.* ¶ 132.) Despite this guidance, neither Ludlow nor Baird had any written or unwritten policy, guidelines, or instructions controlling (or prohibiting) teachers communicating with parents. (*Id.* ¶ 140.) Nor did Ludlow or Baird have any policy regarding the use of students' preferred pronouns or names, when those pronouns or names differed from the ones assigned at birth. (*Id.*)

Plaintiff encountered B.F.'s father in March of 2021 while dropping her vehicle off at his garage. (*Id.* ¶ 141.) The two initially discussed B.F.'s older sibling. The conversation subsequently turned to:

> the phenomenon of gender dysphoria [] then prevalent among certain teens, particularly since the onset of COVID. Ms. Manchester also discussed with the Father efforts then underway by certain teachers and administrators at Baird to assist LGBTQ students in 'regendering', to protect them from bullying and other forms of harassment, and to conceal information from parents, and how all this was a matter of great public concern and controversy among teachers, parents, administers, and

School Committee members, not only in Ludlow but also nationwide. (*Id.* ¶ 143 (parenthetical omitted).) Ultimately, Plaintiff informed B.F.'s father about the February 2021 email sent by B.F. to Baird teachers and staff. (*Id.* ¶ 144.) Plaintiff also indicated her belief the email was written by someone other than B.F. (*Id.*)

This information alarmed B.F.'s parents, particularly in view of their December 2020 email asking that no staff speak to their child regarding mental health, and caused B.F.'s family to seek a meeting with Defendant Monette. (*Id.* ¶¶ 145-46.) Before this meeting occurred, B.F. informed Defendant Foley that Plaintiff had disclosed the contents of B.F.'s email to the parents. (*Id.* ¶ 146.) Defendant Foley informed Defendant Monette, who then informed Defendant Gazda. (*Id.* ¶ 146.) Defendant Gazda directed Defendant Monette and a Ludlow attorney to initiate an investigation into Plaintiff's disclosure of the information. (*Id.* ¶ 147.)

On March 19, 2021, Defendant Monette informed Plaintiff she was being put on paid administrative leave "for conduct unbecoming a teacher related to your inappropriate communications with the parents of a student." (*Id.* ¶ 148.) This letter cited neither a specific communication nor a specific statute, regulation, protocol, or policy as grounds for the decision. (Dkt. 9-2.) Plaintiff was then interviewed by Defendant Monette and the Ludlow attorney on March 25. (*Id.* ¶ 152.) This was followed by a second interview on April 14. (*Id.* ¶ 155.) Plaintiff was represented by counsel at each interview. (*Id.* ¶¶ 152, 155.)

After a delay of several weeks, Defendant Monette informed Plaintiff she was being terminated. (Dkt. No. 9-4.) Monette's letter provided the following grounds for termination: (1) sharing "sensitive confidential information about a student's expressed gender identity against the wishes of the student, the direction of the Guidance Counselor, and in contradiction to the Department of Elementary and Secondary Education's (DESE) guidance"; (2) alleged untruthfulness during the subsequent investigation; and (3) violations of state and federals laws and regulations

governing access to student records. (*Id.*) According to the letter, these acts collectively constituted "conduct unbecoming of a teacher." (*Id.*)

### III.    LEGAL STANDARD

As Defendants' motion is brought pursuant to Fed. R. Civ. P. 12(b)(6), the court applies the standard set forth in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). The complaint must therefore allege "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

When evaluating whether dismissal is appropriate under Rule 12(b)(6), the court must credit well-pleaded factual allegations as true and draw all reasonable inferences from those facts in the non-moving party's favor. *See Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 36 (1st Cir. 2013). "Well-pleaded facts must be non-conclusory and non-speculative." *Barchock v. CVS Health Corp.,* 886 F.3d 43, 48 (1st Cir. 2018) (internal quotation omitted). For a claim to proceed, the complaint must allege enough facts to plausibly establish each material element of the claim and "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." *S.E.C. v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (en banc). Generally, the court's review is limited to allegations in the pleadings, but it "may [also] consider 'implications from documents attached to or fairly incorporated into the complaint,'" *Barchock*, 886 F.3d at 48 (quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012)) (alteration added), as well as "matters of public record, and other matters susceptible to judicial notice," *Newton Covenant Church v. Great Am. Ins. Co.*, 956 F.3d 32, 35 (1st Cir. 2020) (internal quotation marks omitted).

## IV.  DISCUSSION

### A.  Town of Ludlow

Plaintiff has not plausibly alleged any claim sounding in the federal constitution against Ludlow. A municipality may be held liable under Section 1983 only "where the municipality *itself* causes the constitutional violation . . . . *Respondeat superior* or vicarious liability will not attach under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original; alteration added). To satisfy this standard, *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658 (1978) generally requires a plaintiff demonstrate an "affirmative policy decision" which was authorized by the individual or entity endowed with legal authority to set "official municipal policy." *See Thomas v. Town of Chelmsford,* 267 F. Supp. 3d 279, 305-06 (D. Mass. 2017) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) for the first proposition, and quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011) for the second proposition). In Massachusetts, "the school committee in each city or town has policymaking authority." *Thomas*, 267 F. Supp.3d at 306; *see also Doe 1 v. City of Holyoke*, 725 F. Supp. 3d 115, 127 (D. Mass. 2024) (citing Mass. Gen. Law ch. 71, § 37).[4]

---

[4] Plaintiff's opposition brief expressly invokes the DESE guidance as the policy justifying a *Monell* claim. Under Mass. Gen. Law ch. 71, § 37, the school committee is the municipal authority with final decision-making power over the adoption of such a policy. *See Sch. Comm. of Pittsfield v. United Educators of Pittsfield*, 784 N.E.2d 11, 16-17 (Mass. 2003). Plaintiff has not articulated a "final authority" theory of municipal liability as to any other policy or act allowing for imposition of municipal liability based on "[a] single decision by a municipal policymaker," who, under state law, possessed final authority to take the challenged action. *Freeman v. Town of Hudson*, 714 F.3d 29, 38 (1st Cir. 2013). Had Plaintiff advanced such a theory, the *Monell* question would be a slightly closer call, as the Massachusetts Education Reform Act of 1993 vested hiring and firing authority in the Superintendent acting through each school's principal. *United Educators of Pittsfield*, 784 N.E.2d at 17-18. But the same statute granting this authority to the superintendent—Mass. Gen. Law ch. 71, § 42—also indicates that when a terminated teacher challenges the action through arbitration then the "school district shall have the burden of proof," and as a practical matter, the school committee steps into the superintendent's shoes to defend the decision. *Id.* (alteration added); *see also Sch. Comm. of Lexington v. Zagaeski,* 12 N.E.3d 384, 389-90 (Mass. 2014) (illustrating the procedure); *Sch. Comm. of Lowell v. Robishaw*, 925 N.E.2d 803, 808-09 (Mass. 2010) ("General Laws c. 71, § 42 . . . places the burden on the school committee to prove the 'just cause' that served as grounds for dismissal."). Regardless, the constitutional claims against Ludlow would fail for the same substantive reasons articulated as to the individual Defendants.

Plaintiff does not allege the Ludlow School Committee adopted an official municipal policy abridging her First Amendment rights, denying her equal protection of the laws, or depriving her of a protected property interest without due process of law. Rather, Plaintiff suggests Ludlow adopted an unwritten and unconstitutional interpretation of the DESE's guidance regarding Mass. Gen. Law ch. 76, § 5, before then relying on this policy to justify firing her. Even accepting this allegation (and her assertion she was unaware of the policy) as true, the First Circuit recently held this unwritten policy was constitutional as a matter of law, as the protocol did not infringe on fundamental rights and has "a rational relationship to the legitimate objective of promoting a safe and inclusive environment for students." *Foote v. Ludlow Sch. Comm.,* 128 F.4th 336, 357 (1st Cir. 2025); *see also id.* at 343, 352-57.[5] The complaint goes on to affirmatively allege there were "never promulgated policies, guidelines, or instructions, written or otherwise, governing teacher communications with parents, much less prohibitions regarding parent-teacher communications . . . [or] address[ing] the use of student's preferred names or preferred pronouns when different from students' enrolled name or birth pronouns" endorsed by the Ludlow School Committee, meaning there is no other well-pled policy basis for a *Monell* claim.. (Dkt. No. 9, ¶ 140 (alterations added).) But even if Plaintiff had articulated a theory of *Monell* liability, the claims against Ludlow would still be dismissed, as Plaintiff has not adequately alleged any violation of the federal constitution for the reasons discussed in detail later. Accordingly, Counts III, IV, and VI, and VII are dismissed for failing to state a claim upon which relief may be granted as to the Town of Ludlow.

---

[5] The court recognizes this was an as-applied challenge. *See Foote*, 128 F.4th at 357. However, as Plaintiff's claim arises from the same incident as *Foote*, the court finds the decision's finding of constitutionality persuasively applicable to this case.

### B.    Individual Defendants

#### 1.    *First Amendment*

##### a.    *Content/Viewpoint Discrimination (Count III)*

Count III does not state a claim upon which relief may be granted. A claim sounding in the First Amendment's content and viewpoint restriction jurisprudence must preliminarily identify a restriction—typically a statute, administrative regulation, or ordinance—promulgated by the government that is targeting or limiting speech. *See, e.g., McCoy v. Town of Pittsfield, NH,* 59 F.4th 497, 505-07 (1st Cir. 2023) (town ordinance); *Am. Freedom Def. Initiative v. Massachusetts Bay Transp. Auth.*, 781 F.3d 571, 574 (1st Cir. 2015) (administrative advertising guidelines); *Sullivan v. City of Augusta*, 511 F.3d 16, 32-33 (1st Cir. 2007) (ordinance); *McGuire v. Reilly*, 386 F.3d 45, 57 (1st Cir. 2004) (statute). Plaintiff does not allege she was prevented from expressing her views on "gender dysphoria" by a governmentally imposed restriction; rather, she alleges Gazda and Monette punished her after they learned she had expressed these views. This is a retaliation theory of liability, not a theory implicating content or viewpoint discrimination as those terms have been articulated by the Supreme Court and the First Circuit. Accordingly, Count III is dismissed.

##### b.    *Retaliation (Count IV)*

"The right to speak on matters of public concern is guaranteed by the First Amendment." *MacRae v. Mattos*, 106 F.4th 122, 132 (1st Cir. 2024). Public employees do not surrender this right because of their employment status, but "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Consequently, public employees do "not gain any special advantage in disputes of a private nature, such as garden variety employment beefs, merely because the employer happens to be a state actor" because "[t]he First and Fourteenth Amendments do not 'constitutionalize' the employer/employee relationship simply because the employer happens to be a governmental agency."

*Bennett v. City of Holyoke*, 230 F. Supp. 2d 207, 223 (D. Mass. 2002), *aff'd*, 362 F.3d 1 (1st Cir. 2004).

In evaluating whether Plaintiff has plausibly alleged the conduct in question violates the federal constitution, the court applies the "well-established framework announced by the Supreme Court in *Garcetti*." *MacRae*, 106 F.4th at 133 (internal citation omitted). First, the court asks, "whether the employee spoke as a citizen on a matter of public concern." *Id.* (quoting *Garcetti*, 547 U.S. at 418). If the employee did not, "the inquiry ends there and the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Id.* (internal quotation marks omitted). Assuming the employee did speak as a citizen on a matter of public concern, at step two, the court "must determine whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.* (internal quotation marks omitted). This requires "balance[ing] the interests of the employee, as a citizen, in commenting upon matters of concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* (quoting *Davignon v. Hodgson*, 524 F.3d 91, 100 (1st Cir. 2008)). If the government's interest is outweighed by the Plaintiff's interest, the court proceeds to step-three, where it considers whether the protected speech "was a substantial or motivating factor in the adverse employment decision." *Id.*

In her complaint, Plaintiff sufficiently alleges she was not speaking in her official capacity as a Ludlow teacher but rather as a private citizen when speaking with B.F.'s father. According to Plaintiff, this ends the court's analysis because, she says, "[m]atter of public concern' analysis [the next step in the court's review] comes into play only after it is determined that the subject speech was not 'citizen speech' but speech made pursuant to an employee's official duties." (Dkt. No. 34 at 19 (alteration added).) This court views Plaintiff's position as incorrect as a matter of law. Plaintiff would not have a viable First Amendment claim if her comments were made pursuant to her official duties, but the inverse proposition is not also true; she cannot survive a motion to dismiss solely because her

comments were made in a personal capacity. *See MacRae*, 106 F.4th at 127-28, 133, 136 (illustrating *Garcetti* analysis does not end after court finds speech is made in a private capacity); *Decotiis v. Whittemore*, 635 F.3d 22, 27-28, 29-35 (1st Cir. 2011) (same); *Meagher v. Andover Sch. Comm.*, 94 F. Supp. 3d 21, 29-30, 36-37 (D. Mass. 2015) (same); *Oliveira v. Ellison-Lopes*, No. 23-CV-10647-DJC, 2024 WL 126178, at *3-5 (D. Mass. Jan. 11, 2024) (same). Rather, when a government employee speaks on a matter of purely private concern in her personal capacity, the First Amendment is not implicated at all, and she may be disciplined in the same manner as an employee working in the private sector. *Connick v. Myers*, 461 U.S. 138, 147 (1983); *see also Rosaura Bldg. Corp. v. Municipality of Mayaguez*, 778 F.3d 55, 66-67 (1st Cir. 2015) ("If plaintiff's speech is not on a matter of public concern, there is no First Amendment cause of action.").

Turning, as the court must, to whether the speech was on a matter of public concern, Plaintiff narrowly alleges sufficient facts for the court to infer her conversation with B.F.'s father addressed a matter of public concern. "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2014). "The inquiry turns on the 'content, form, and context' of the speech." *Id.* (quoting *Connick*, 461 U.S. at 147-48)). As relevant here, the Supreme Court previously explained "sexual orientation and gender identity" are "sensitive political topics, and they are undoubtedly matters of profound 'value and concern to the public.'" *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 913-914 (2018); *see also MacRae,* 106 F.4th at 136 (accepting parties' representations that gender identity and sexual orientation can constitute matters of public concern); *Meriwether v. Hartop,* 992 F.3d 492, 508-509 (6th Cir. 2021). Baird's policies and procedures (or lack thereof) for addressing complex questions of gender identity raised by middle school students are matters of political or social concern in the community.

As the complaint supports an allegation Plaintiff spoke in her personal capacity on a matter of public concern, the court moves to step two of the *Garcetti* framework. Commonly referred to as *Pickering* balancing, *see Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois,* 391 U.S. 563 (1968), this analysis "requires a balancing of the value of an employee's speech against the employer's legitimate government interest in preventing unnecessary disruptions and inefficiencies in carrying out its public service mission." *MacRae,* 106 F.4th at 136 (quoting *Davignon v. Hodgson,* 524 F.3d 91,103 (1st Cir. 2008)).[6] "The government employer's interest must be proportional to the value of the employee's speech; in other words, the stronger the First Amendment interests in the speech, the stronger the justification the employer must have." *Id.* (internal quotation marks omitted). In weighing the interests, the court considers (1) the time, place, and manner of the speech, and (2) the government's motivation for making the employment decision. *Id.* Ultimately, if "the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public . . . then the employee's speech is not constitutionally protected and no First Amendment retaliation claim lies." *Id.* (quoting *Garcetti,* 547 U.S. at 418).[7]

Here, the *Pickering* balance weighs in favor of the Defendants. In the public-school setting, the

---

[6] At oral argument, Plaintiff suggested the court should not engage in *Pickering* analysis because the parties did not raise it in their briefs. However, "resolution of the question is . . . a matter of law for the court to decide." *Bruce v. Worcester Reg'l Transit Auth.,* 34 F.4th 129, 138 (1st Cir. 2022). Once an issue of constitutional law is implicated, the court is obligated to apply the appropriate legal test, regardless of the parties' failure to identify or brief the test correctly. *See Foote,* 128 F.4th at 347 n. 13; *see also Wadsworth v. Nguyen,* 129 F.4th 38, 54 n. 11 (1st Cir. 2025).

[7] *Pickering* balancing is often difficult to engage in at the motion to dismiss stage. The First Circuit has, however, never said it is *per se* impermissible, as it is a question of law for the court to ultimately decide. *See Curran v. Cousins,* 509 F.3d 36, 45 (1st Cir. 2007) (engaging in *Pickering* balancing when examining a motion for judgment on the pleadings); *Garza v. Escobar,* 972 F.3d 721, 728 (5th Cir. 2020) (noting a plaintiff may "plead[] her way into *Pickering* balancing"); *Weisbuch v. Cnty. of Los Angeles,* 119 F.3d 778, 783 n. 1 (9th Cir. 1997); *Heller v. Bedford Cent. Sch. Dist.,* 144 F. Supp. 3d 596, 619-20 (S.D.N.Y. 2015) (applying *Pickering* to dismiss teacher's complaint), *aff'd,* 665 F. App'x 49 (2d Cir. 2016). Given the degree of detail derived from Plaintiff's own allegations and exhibits, the court does find this to be a case where the well-pleaded facts simply do not survive *Pickering* analysis.

government has a "strong interest in preserving a collegial atmosphere, harmonious relations among teachers, and respect for the curriculum." *Estock v. City of Westfield*, 806 F. Supp. 2d 294, 308 (D. Mass. 2011) (quoting *Hennessy v. City of Melrose*, 194 F.3d 237, 248-49 (1st Cir. 1999)). It is also a "well-accepted tenet[] that '[t]he successful operation of a [public] school requires the person in charge to be in charge and to maintain close working relationships with each of her teachers.'" *Id.* (quoting *Hennessy*, 194 F.3d at 248) (first alteration added; second and third alterations in original). Additionally, the First Circuit has recognized schools have a "a compelling interest in protecting the physical and psychological well-being of minors," and this interest is "at its apex" when dealing with especially vulnerable children, "such as transgender minors." *Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 356-57 (1st Cir. 2025) (internal quotation mark omitted). Schools may foster "a space for students to express their identity without worrying about parental backlash" to further this interest. *Id.* at 357. As set forth in the termination letter annexed to the complaint, promoting and protecting these recognized interests was the stated rationale behind terminating Plaintiff for conduct unbecoming a teacher. (Dkt. No. 9-4.)

Compared with these strong governmental interests, Plaintiff's interest in the speech alleged in the complaint was minimal. She was not speaking in a public setting and did not limit herself to discussing Ludlow's policies in general. *See, e.g., Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 467-73 (3d Cir. 2015) (affording teacher's blog posts discussing specific students little First Amendment value for purposes of *Pickering*), *as amended* (Oct. 25, 2019); *Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1120-21 (7th Cir. 2013) (concluding book written by school guidance counselor was entitled to minimal protection under *Pickering*). Rather, she was discussing these policies and concerns in the context of an ostensibly private conversation with the father of a student for whom the issue of Ludlow's gender related policies was a deeply personal matter. The conversation quickly turned from discussion of Ludlow's broader policies (a public concern) to discussion of the specifics of B.F.'s

13

situation (not a public concern). And, during this discussion, Plaintiff admittedly ignored the request of B.F.'s guidance counselor to not inform B.F.'s parents about the name and pronoun change until B.F. could speak with them. Plaintiff further indicated her belief that Baird faculty were attempting to "regender[]" students and insinuated third-parties authored B.F.'s email to school officials.

Even when considered in a light most favorable to Plaintiff, these actions imperiled harmonious relations among teachers, while usurping the chain of command and delineation of responsibility upon which efficient public education relies. Plaintiff does not plausibly allege this was not the case, but rather alleges she acted to prevent a "grave moral wrong" and avoid setting an "immoral example." (Dkt. No. 9, ¶¶ 172-73.)[8] Beyond the interest in harmony, Plaintiff also undermined Baird's compelling interest in preserving an inclusive and safe environment for B.F., an environment the First Circuit has recognized as most conducive to ensuring the equalization of educational opportunities, by exposing the child to potential parental backlash. *Foote*, 128 F.4th at 357. The complaint alleges Plaintiff had a countervailing "duty and [] responsibility" to tell B.F.'s parents. (Dkt. No. 9, ¶ 172.) But, even accepting as true the assertion such a duty exists, it appears to arise from Plaintiff's own moral code rather than state law or the federal constitution. These beliefs, even if sincerely held, do not insulate Plaintiff from the employment related consequences of her choice to undercut the school's greater (and constitutionally recognized) interest in protecting an inclusive and

---

[8] The complaint contains numerous allegations that these gender related issues were causing tremendous tensions between teachers and parents at Baird. (*See, e.g.,* Dkt. No. 9, ¶¶ 9, 47- 106, 124- 140, 143, 146-47; Dkt. No. 9-1.) These factual allegations undercut the bald assertion that "Ms. Manchester in her friend-to-friend conversation with the Father did not affect in any way the operations of the School or impair its ability to operate efficiently and effectively." (Dkt. No. 9, ¶ 171.) Similarly, the court does not credit the conclusion that "nothing in the record compiled to date suggests the sort of parental dysfunctionality that would result in harm to the Female Child as a result of plaintiff's conduct." (Dkt. No. 9, ¶ 171.) As articulated in *Foote*, Baird's interest in preserving an inclusive and safe environment could rationally justify a blanket instruction that teachers not "offer information—[regarding] a student's gender identity—without a student's consent." *Foote*, 128 F.4th at 355 (alteration added); *see also id.* at 357.

safe environment for transgender minors as a matter of law. Therefore, the content and context of Plaintiff's speech, "while touching on matters of public concern, did not outweigh the school's considerable interest as an employer in guarding against the impairment of relations among teachers," preventing insubordination, and preserving an inclusive school environment. *Hennessy*, 194 F.3d at 247-48. Accordingly, Count IV is dismissed.

    *2. Equal Protection (Count VI)*

    Plaintiff's equal protection claim requires she adequately allege that "compared to others, similarly situated, [she] was selectively treated . . . based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Lay v. City of Lowell*, --F. Supp.3d--, No. CV 24-10514-NMG, 2024 WL 5076365, at *4 (D. Mass. Dec. 11, 2024) (alteration added) (quoting *Marrero-Gutierrez v. Molina*, 491 F.3d 1, 9 (1st Cir. 2007)); *see also Rectrix Aerodrome Centers, Inc. v. Barnstable Mun. Airport Comm'n*, 610 F.3d 8, 15 (1st Cir. 2010). Uniquely, in the public employment context, the Supreme Court has expressly held that "the class-of-one theory of equal protection has no application," meaning Plaintiff must allege she is a member of a protected class, or that the state action impinges upon a fundamental right. *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 607 (2008). There are no allegations Plaintiff belongs to a protected class, as this typically "involves characteristics that define a discrete group, which are generally immutable or otherwise not within the members' control." *N. End Chamber of Com. v. City of Bos.*, --F. Supp.3d--, No. CV 24-10039-LTS, 2024 WL 5197557, at *6 n. 7 (D. Mass. Dec. 20, 2024). Plaintiff instead alleges she was discriminated against for exercising her First Amendment rights.

    Plaintiff, however, does not state an equal protection claim sounding in fundamental rights for two independent reasons. First, her "equal protection claim fails because it is a mere restatement of its First Amendment claim and based on the same facts." *Rosaura Bldg. Corp. v. Municipality of Mayaguez*, 778 F.3d 55, 68 (1st Cir. 2015) (alteration added). "[R]etaliation claims under the First

Amendment cannot be restated as claims under the Equal Protection Clause." *Uphoff Figueroa v. Alejandro*, 597 F.3d 423, 426 (1st Cir. 2010).[9] Next, she has also not alleged the existence of an individual who was "similarly situated [to Plaintiff] in all relevant respects," but treated more favorably. *Barrington Cove Ltd. P'ship v. Rhode Island Hous. & Mortg. Fin. Corp.*, 246 F.3d 1, 8 (1st Cir. 2001) (internal quotation marks omitted); *see also McCoy v. Town of Pittsfield, NH*, 59 F.4th 497, 508 (1st Cir. 2023) (explaining equal protection claim sounding in a fundamental rights theory typically requires an appropriate comparator); *Signs for Jesus v. Town of Pembroke, NH*, 977 F.3d 93, 113 (1st Cir. 2020) (same); *Harron v. Town of Franklin*, 660 F.3d 531, 537 (1st Cir. 2011) (dismissing complaint for failing to plead existence of an appropriate comparator as required to allege discriminatory animus).[10] The complaint refers generally to several other teachers who protested or spoke out against Ludlow's gender policies. But these proposed comparators are not similarly situated, as there is no indication any of them engaged in these activities *and* spoke to the parent of a child questioning their gender identify outside of school grounds, thereby directly contravening a request from the child's guidance counselor. Count

---

[9] Plaintiff argues several of the allegations underlying the equal protection claim are "analytically distinct from those giving rise to Plaintiff's First Amendment claim." (Dkt. No. 34 at 26.) But upon review each of the listed allegations plainly implicates the First Amendment, not the Equal Protection Clause. (Dkt. No. 9, ¶ 220.)

[10] A comparator is not always necessary to state an equal protection claim. *See Wadsworth v. Nguyen,* 129 F.4th 38, 54 (1st Cir. 2025); *see also id.* at 72-74 (Rikelman, J., concurring). Rather, allegations that a similar situated comparator exists are a proxy used to demonstrate the discriminatory animus necessary to allege such a claim. *See id.* at 72; *Fincher v. Town of Brookline*, 26 F.4th 479, 486 (1st Cir. 2022). (explaining, "in the absence of direct proof that racial animus caused the adverse action," comparator evidence is necessary to sustain an equal protection claim). Here, there are no well pled factual allegations, as opposed to legal conclusions couched as factual allegations, supporting a plausible inference Defendants Gazda or Monette acted with "an invidious discriminatory purpose." *Donahue v. City of Bos.*, 371 F.3d 7, 14 (1st Cir. 2004) (quoting *Washington v. Davis,* 426 U.S. 229, 242 (1976)). In the absence of such allegations, Plaintiff was required to allege the existence of appropriate comparators to sustain her equal protection claim, as "[a]n equal protection claimant may not prevail [against a Rule 12(b)(6) motion] simply by asserting an inequity and tacking on the self-serving conclusion that the defendant was motivated by a discriminatory animus." *Zell v. Ricci*, 957 F.3d 1, 13-14 (1st Cir. 2020) (first alteration added; second alteration in original; internal quotation marks omitted).

VI is therefore dismissed.

   *3. Due Process (Count VII)*

   *a. Procedural Due Process*

   To state a procedural due process claim, Plaintiff must allege (1) she was deprived of a protected property interest, and (2) this deprivation was accomplished without adequate process. *Perez-Acevedo v. Rivero-Cubano*, 520 F.3d 26, 30 (1st Cir. 2008). As the parties do not dispute Plaintiff's continued employment as a teacher is a property right created by state law, the court's analysis focuses solely on whether Plaintiff adequately alleges her termination was accomplished without adequate process.

   Generally, "the essential components of a pretermination due process hearing [are] 'oral or written notice of the charges against [her], an explanation of the employer's evidence, and an opportunity to present [her] side of the story.'" *Lawless*, 63 F.4th at 67 (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985)) (first alteration added; second and third alterations in original). Massachusetts General Law Ch. 71, § 42 effectuates these procedural guarantees by requiring school districts provide tenured teachers with written notice of the grounds for termination in sufficient detail for the teacher to respond. *Id.* Tenured teachers are also entitled to review all documents related to or supporting the dismissal. *Id.* They then must have an opportunity to meet with school officials in the presence of counsel before termination. *Id.* These procedures satisfy *Loudermill*'s minimal requirements, as "the purpose of the termination hearing is solely to serve as 'an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.'" *Chmielinski v. Massachusetts*, 513 F.3d 309, 316 (1st Cir. 2008) (quoting *Loudermill*, 470 U.S. at 545-46); *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 23-24 (1st Cir. 1999) (discussing *Loudermill*'s requirements in the context of Section 42).

Under Section 42, Plaintiff received all the formal pretermination process she was due. She was alerted to the charges against her through a letter sent well before her ultimate termination. Plaintiff and her counsel then met with school officials not once but twice to discuss the matter, providing an opportunity to be heard regarding her version of events and an opportunity to learn in further detail the nature of the allegations against her. Even when viewed in a light most favorable to Plaintiff, Defendants met their obligations imposed by *Loudermill*, as "[t]o require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." *Loudermill*, 470 U.S. at 546.

Plaintiff next alleges that, even if her termination was accomplished through nominal adherence to the established procedures, several factors combined to render her pretermination hearing constitutionally insufficient as a practical matter. Specifically, she claims she was denied access to her school records, she had no opportunity to present or question witnesses, the questions posed to her at these hearings were less than precise, and her claim was heard by a biased decisionmaker. But "[m]ost of [Plaintiff's] allegations are a call to transpose the procedural protections of a court of law into [her] termination hearing." *Chmielinski*, 513 F.3d at 316 (alteration added). The First Circuit has previously held parties do not have a constitutional right to pre-hearing discovery, nor do they have a right to present and question witnesses. *Id.* at 316-17. Moreover, "the allegations involved [Plaintiff's] own conduct, known to [her]" and "[f]rom this [she] could testify and assemble a defense." *Id.* at 317. And while novel, Plaintiff's assertion her questioning was so inartful as to violate due process is not grounded in the law; inartful questioning does not rise to the level of a constitutional violation as nothing constitutionally requires "the state follow best practices." *O'Neill v. Baker*, 210 F.3d 41, 49 n. 10 (1st Cir. 2000). Similarly, Plaintiff's bias allegations are an unpersuasive rationale on which to rest a procedural due process claim, as "there is not even a basic requirement that hearing officers be impartial in the employment context," and "it is clearly established that employing authorities may

18

preside at termination hearings even though they instituted the termination proceedings." *Lawless*, 63 F.4th at 68; *see also Acosta-Sepulveda v. Hernandez-Purcell*, 889 F.2d 9, 12 (1st Cir. 1989) ("Contrary to the district court's premise, it is not required that a hearing be conducted before an impartial decisionmaker.").

Finally, even if the individual Defendants failed to afford Plaintiff the pretermination process that she was entitled to receive, the complaint still fails to state a claim upon which relief may be granted. Under the *Parratt-Hudson* doctrine, "if a state provides adequate postdeprivation remedies— either by statute or through the common-law tort remedies available in its courts—no claim of a violation of procedural due process can be brought under § 1983 against the state officials whose random and unauthorized conduct occasioned the deprivation." *Lowe v. Scott*, 959 F.2d 323, 340 (1st Cir. 1992) (citing *Parratt v. Taylor,* 451 U.S. 527 (1981) and *Hudson v. Palmer,* 468 U.S. 517 (1984)); *see also Lawless*, 63 F.4th at 69 n. 6; *Toney v. Guerriero*, 633 F. Supp. 3d 404, 407-08 (D. Mass. 2022), *aff'd*, No. 22-1822, 2023 WL 7321897 (1st Cir. Sept. 1, 2023). Section 42 offered Plaintiff an avenue to challenge her termination through arbitration before a neutral arbitrator provided by the American Arbitration Association, but she apparently did not do so. *See Atwater v. Comm'r of Educ.,* 957 N.E.2d 1060, 1069 (Mass. 2011) ("[W]here a teacher's right to continued employment is created by statute, the Legislature permissibly may require arbitration as the method of dispute resolution where a teacher is dismissed and chooses to review the dismissal decision."); *see also Senra v. Town of Smithfield,* 715 F.3d 34, 39 (1st Cir. 2013); *Wojcik v. Massachusetts State Lottery Comm'n*, 300 F.3d 92, 102 (1st Cir. 2002). Because of her failure to pursue arbitration, she cannot bring procedural due process claims against these Defendants, as "the Due Process Clause of the Fourteenth Amendment does not turn into 'a font of tort law to be superimposed upon whatever systems may already be administered by the States.'" *San Geronimo Caribe Project, Inc. v. Acevedo-Vila,* 687 F.3d 465, 481 (1st Cir. 2012) (en banc) (quoting *Albright v. Oliver,* 510 U.S. 266, 284 (1994) (Kennedy, J., concurring)).

  *b. Substantive Due Process*

  In addition to procedural due process, "the Supreme Court has held for nearly one hundred years that the Due Process Clause's explicit promise of 'liberty' ensures certain fundamental rights." *Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 345 (1st Cir. 2025). These fundamental rights are protected by "[t]he constitutional guarantee of substantive due process." *Gonzalez-Droz v. Gonzalez-Colon*, 660 F.3d 1, 15 (1st Cir. 2011) (alteration added).

  Before analyzing whether the government's conduct violates substantive due process, the court must "begin[] by asking whether the challenged government conduct is legislative or executive in nature," as this distinction determines the legal standard applied to assess the conduct's constitutionality. *Foote*, 128 F.4th at 345 (alteration added; internal quotation mark omitted). Executive acts are reviewed using the shocks-the-conscience approach, while legislative acts are categorized based on the fundamental right they restrict (or lack thereof), then assessed using the appropriate degree of constitutional scrutiny (*e.g.*, strict scrutiny, intermediate scrutiny, or rational basis). *Id.* at 346. In general, statutes, administrative regulations, executive orders, and governmental policies "are typically deemed legislative," as they are generally "broadly applicable." *Id.* at 345. By contrast, "individual acts of government officials are often and ordinarily executive in nature, untethered from any policy." *Id.* As persuasively relevant here, "[e]xecutive acts, such as employment decisions, typically apply to one person or to a limited number of persons, while legislative acts, generally laws and broad executive regulations, apply to large segments of society." *Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 139 n. 1 (3d Cir. 2000) (Alito, J.); *see also Littlejohn v. Sch. Bd. of Leon Cnty., Fla.*, 132 F.4th 1232, 1242 (11th Cir. 2025) (noting a "school board rule of general applicability" is legislative, but an "administrative decision" impacting "only a limited class of persons" is executive). Plaintiff challenges "a specific act of [two] governmental officer[s]"—her termination from public employment; this specific act does not apply to or impact a broad swath of society but, rather, was felt entirely by this

Plaintiff. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (alterations added); *see also Mirabella v. Town of Lexington, Massachusetts,* 64 F.4th 55, 56 (1st Cir. 2023) (affirming use of shocks-the-conscience test in the municipal employment context); *Thomas v. Town of Salisbury*, 134 F. Supp. 3d 633, 647 (D. Mass. 2015) (applying the shocks-the-conscience test in the municipal employment setting); *Dobelle v. Flynn*, 12 F. Supp. 3d 274, 290-91 (D. Mass. 2014) (same). The complaint therefore challenges an executive act.

Having categorized the challenged government conduct as executive, it is appropriate to apply the shocks-the-conscience test to determine whether Defendants' conduct violated substantive due process. *Foote*, 128 F.4th at 346. Under this standard, Plaintiff "must show *both* that the [governmental] acts [complained of in the complaint] were so egregious as to shock the conscience *and* that they deprived [her] of a protected interest in life, liberty, or property." *Pagan v. Calderon*, 448 F.3d 16, 32 (1st Cir. 2006) (emphasis in original; alterations added). "Only after show[ing] a constitutionally significant level of culpability may a plaintiff turn to establishing that a protected right was offended." *Abdisamad v. City of Lewiston*, 960 F.3d 56, 60 (1st Cir. 2020). Plaintiff has not alleged the requisite degree of culpability, as Plaintiff's termination for engaging in an unauthorized discussion with B.F.'s father was not a violation "of personal rights so severe[,] so disproportionate to the need presented, and so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *Harron v. Town of Franklin*, 660 F.3d 531, 536 (1st Cir. 2011) (internal quotation mark omitted; alteration in original); *see also Amsden v. Moran,* 904 F.2d 748, 754 n. 5 (1st Cir. 1990) ("In the substantive due process context, the requisite arbitrariness and caprice must be stunning, evidencing more than humdrum legal error."). Substantive due process is intended to prevent governmental conduct that strays "too close to the rack and the screw," *Rochin v. California*, 342 U.S. 165, 172 (1952); these stringent requirements are not satisfied by allegations that amount to an employment dispute regarding

whether Plaintiff was fired for sufficient cause and with sufficient process, *see, e.g., Cummings v. City of Newton*, 298 F. Supp. 3d 279, 288 (D. Mass. 2018); *Thomas v. Town of Salisbury*, 134 F. Supp. 3d 633, 647-48 (D. Mass. 2015); *McCann v. City of Lawrence*, 659 F. Supp. 2d 243, 250 (D. Mass. 2009).

Finally, in addition to not alleging conscience-shocking behavior, the complaint also fails to identity a fundamental right protected by substantive due process. "Substantive due process protects only those interests that implicate one of 'those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 880 n. 13 (1st Cir. 2010) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997)). The right to continued public employment is not such a right because, as the Eleventh Circuit persuasively explained:

> Supreme Court precedent demonstrates that an employee with a property right in employment is protected only by the procedural component of the Due Process Clause, not its substantive component. Because employment rights are state-created rights and are not 'fundamental' rights created by the Constitution, they do not enjoy substantive due process protection

*McKinney v. Pate*, 20 F.3d 1550, 1560 (11th Cir. 1994) (en banc); *see also Nelson v. City of Chicago*, 992 F.3d 599, 604 (7th Cir. 2021) ("Officer Nelson asserts that she has a property interest in her job. But if she intended her job to be a basis of her substantive due process claim as well, that theory fails."); *Santiago de Castro v. Morales Medina*, 943 F.2d 129, 131 (1st Cir. 1991) (cautioning against allowing substantive due process to "embroil federal courts in everyday workplace disputes between employers and their employees"); *Christensen v. Kingston Sch. Comm.*, 360 F. Supp. 2d 212, 223 (D. Mass. 2005) (citing *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 229 (1985) (Powell, J. concurring), explaining substantive due process only protects rights arising from the federal constitution); *cf. Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1979) (declining to find the right to public employment fundamental for purposes of triggering strict scrutiny under the Equal Protection Clause). Furthermore, to the extent

Plaintiff relies on the First Amendment as the source of her asserted fundamental right, this count is "coextensive with h[er] First Amendment claim," meaning "there is obviously no need to enter the uncharted thicket of substantive due process to find an avenue for relief" when Plaintiff has not identified an underlying violation of the First Amendment. *Nestor Colon Medina & Sucesores, Inc. v. Custodio*, 964 F.2d 32, 46 (1st Cir. 1992) (alteration in first quotation added).

Accordingly, Count VII is dismissed in its entirety.

### C.     Supplemental Jurisdiction and Motion to Strike

Plaintiff's remaining claims—Counts I, II, and V—all arise out of Massachusetts law. Although the complaint attempts to invoke this court's diversity jurisdiction under 28 U.S.C. § 1332(a)(1), Plaintiff is a citizen of Massachusetts, as are Defendants Monette and Foley. (Dkt. No. 9, ¶¶ 14, 19, 22-23.) Diversity jurisdiction is therefore improper, as Section 1332(a)(1) only applies when "the citizenship of each plaintiff is diverse from the citizenship of each defendant." *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 (1996); *BRT Mgmt. LLC v. Malden Storage LLC*, 68 F.4th 691, 695 (1st Cir. 2023) ("[N]o plaintiff may be a citizen of the same state as any defendant."). Thus, the court's jurisdiction is based solely on 28 U.S.C. § 1331 (federal question). The court consequently declines to exercise supplemental jurisdiction over the state law claims in the absence of any viable federal claims. *See Sexual Minorities Uganda v. Lively*, 254 F. Supp. 3d 262, 270 (D. Mass. 2017), *aff'd in part, appeal dismissed in part*, 899 F.3d 24 (1st Cir. 2018); *see also Lambert v. Fiorentini*, 949 F.3d 22, 29 (1st Cir. 2020). Accordingly, these claims are dismissed without prejudice.

In addition, the court finds Defendants' motion to strike is now moot. However, the court does note that the complaint frequently uses overheated language and makes gratuitous personal attacks that are not legally necessary or relevant to the claims at issue in this case. Including legally unnecessary language in filings risks "degrad[ing] the dignity and decorum of the court and hamper[ing] 'the orderly and expeditious disposition of cases.'" *Arunachalam v. Int'l Bus. Machines Corp.*,

989 F.3d 988, 1001 (Fed. Cir. 2021) (alteration added) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)); *McLeod v. Fessenden Sch.,* 626 F. Supp. 3d 220, 223 (D. Mass. 2022) (striking "inappropriate editorial statements"); *Nwaubani v. Grossman*, No. CV 13-12552-JLT, 2014 WL 12914528, at *3 (D. Mass. Feb. 28, 2014) ("A complaint should not be 'swollen with irrelevant rhetorical flourishes.'" (quoting *Sherwood Forest Neighbors Ass'n, Inc. v. Town of Becket*, 466 F. Supp. 2d 399, 401 (D. Mass. 2006))). The court recognizes the issues implicated by this case are sensitive, and for the parties highly personal, but all participants in the civil justice system should strive to adhere to high standards of civility.

## V.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. (Dkt. No. 18.) This case may now be closed.

It is So Ordered.

   _/s/ Mark G. Mastroianni_____
MARK G. MASTROIANNI
United States District Judge